Smith et al. vs. The State.

| 14 | 147 |
| 33a | 514 |
| 14 | 147 |
| 134 | 28 |

## SMITH ET AL. vs. THE STATE OF MISSOURI.

1. The common law concerning the offence of riot is not in force in this State.

2. In order to constitute a riot under the 6th sec. of the 7th article of the act concerning crimes and punishments, it is necessary that the act done or attempted should be an "unlawful act," and done in a violent or turbulent manner.

## APPEAL from St. Louis Criminal Court.

### STATEMENT OF THE CASE.

Smith and others were indicted for a riot under the 6th sec., 7th art. of the act concerning crimes and their punishment. R. C. p. 394.

The defendants were arrested and brought into court, and plead not guilty, and on the 2)th

Smith et al. vs. The State.

August, 1849, went to trial, when Levi, James and John Smith, John Ball, Silas W. Ganiot and John Prant were found guilty.

Walter Adams wes sworn as a witness for the State, who testified among other things in substance, that he was employed by Wm. C. Martin to split rails for him and do o'her work for him, and that he with others had built the house for Martin, that was torn down by the defendants. That on the evening before the riot, Levi Smith, John Smith and John Ball came to the building and wanted witness and the other men at work in the house to assist them in pulling the house down, which witness refused to do. One of the troop said it should be done. Smith said they had come to tear down the house, but they could not do it unless there were more of them. Levi Smith returned next day with nine others, and defendants pulled down the house, and then set fire to the ruins, and they were consumed. Witness had then been working some two or three weeks in Wm. C. Martin's employ, and with others had built the house for Mr. Martin, and were then occupying the house on the land of Martin. That prior to the commencement of pulling down the house, Smith and his party ordered him (witness,) and the other inmates to leave—that they did not resist the pulling down of the house, because there was no use to resist.

On the cross-examination, the defendants' counsel asked the witness the following question: When Levi Smith told you he came to pull down the house, and told you to leave it, did he at that time tell you that the land was his; that he had purchased it from Wm. C. Martin? This question was objected to by the State, and the objection sustained, to which defendants excepted.

Jalin Ragen was then sworn for the State, who stated, among other things, that when he was ordered to leave the house—he did so for fear of being hurt by the falling timbers.

John Carter was then sworn as a witness for the State, who testified substantially as above.

On his cross-examination he was asked the following question by defendants: Who was with you at work when he, (Smith) forbade the cutting of rails? Objected to and objection sustained, to which exception was taken. Defendants exhibited a transcript of a judgment sworned before V. C. Music, a justice of the peace in favor of Levi Smith against John Carter and others in trespass, for cutting timber on plaintiff's land, in St. Louis county, St. Ferdinand town, and then asked the following question: Are you the same John Carter, who, with others was sued by Levi Smith before Justice McClure for trespassing upon his land? Objected to—objection sustained—excepted to. Defendants' counsel then asked the following question: "Is the land, for trespassing on which you were sued, the same piece of land on which you were building the log house which defendants pulled down?" Objected to— sustained—exception taken.

The defendants' counsel then asked the following question: "Were any other persons sued with you by Levi Smith before justice Music?" Objected to—sustained—exceptions taken.

Wm. C. Martin was then introduced as a witness for the State, who swore, among other things, in substance, that he bought the tract of land on which the house in question was situated, of the heirs of Frederick Bates; upon the reputation of Levi Smith, insisting that the title of Bates' heirs was good. That Smith afterwards bought of him only such title as he had acquired of the heirs of Bates. Afterwards (Martin) he acquired the legal title of Hempstead. That after he had acquired the latter title of H., he had offered to compromise with Smith and give him back the purchase money with legal interest thereon. That he was in actual possession of the land at the time the same was demolished, and had been in possesson for about two weeks.

Defendants counsel asked the following question : "What did you pay Hempstead for his title?" Objected to—sustained—exceptions taken.

Here State closed.

Defendants then offered in evidence the transcript of suit by Smith vs. Carter et al., for cutting timber on land in question. Objected to—sustained—exceptions taken.

Defendants then offered in evidence a deed made by Wm. C. Martin and wife to Levi Smith for the land in question, which was the same deed alluded to in the testimony of Martin. Objected to—overruled—exceptions taken.

After introducing some witnesses, who testified as to the character of defendants for peace, defendants closed.

Defendants asked the following instructions:

1st. "If the jury believe that Martin, by the deed which he gave Smith, and which is in evidence, conveyed all the title to said land which said Martin then had, this is a fee simple conveyance, although it be a mere quit claim."

2nd. If the jury believe that Martin conveyed by a quit claim deed the land in question, to Smith, and that Smith thereafter entered on the land, and cut timber thereon, or exercised acts of ownership thereon, this was an actual and lawful possession of the whole of said piece of land by Smith, and any entrance thereon afterwards by Martin, without Smith s consent, and without the authority of law, made Martin a trespasser, and Smith was justified in using sufficient and necessary force in putting Martin off such land.

4th. "Cutting timber on land, erecting buildings thereon, without lawful right, such as title thereto, or the consent of the owner, does not give the person doing such acts the lawful possession to such land.

5th. A person, not the owner of land, erecting a house thereon, does it of his own wrong, and the house belongs to the owner of the land, unless there be some agreement to the contrary between him and the owner, or unless as the tenant of the owner erects such house for the purposes of trade.

6th. Before the jury can convict, they must be satisfied that the defendants destroyed the house in question in a forcible, violent and turbulent manner."

The court refused these instructions, to which the defendants excepted.

The court then gave the following instructions:

1st. "Every tumultuous disturbance of the public peace by three or more assembled together, by their own authority, with the intent mutually to assist one another against any who shall oppose them in the execution of some private object, and afterwards executing the same in a violent and turbulent manner to the terror of the people, whether the act is lawful or unlawful, is a riot. If, therefore, you find from the evidence that the defendants, or any three of them, in the county of St. Louis, and within one year before the finding of this indictment, did assemble together at the place described in the indictment, with the intent mutually to assist one another to burn or destroy a house, as mentioned in the indictment in the course of construction by Wm. Martin, or his agents, and that the said house was in the possession of said Martin or his agents, and that the defendants did so burn or destroy, to the terror of the people then and there being, in a violent and turbulent manner, you will find the defendants guilty of a misdemeanor, and assess their punishment by imprisonment in the county jail not exceeding one year, or by fine not exceeding five hundred dollars, or by both such fine and imprisonment."

2nd. "Much has been said upon the subject of legal possession, actual possession, and constructive possession of the land upon which the house stood, mentioned in the indictment. If you find from the evidence that the workmen engaged in the construction or finishing of the house mentioned in the indictment, were the workmen employed by Wm. C. Martin, and that said Martin did either by himself or his workmen, cut timber from the land for the purpose of building said house, and that the workmen of said Martin were in said house, and in the employ of said Martin at the time the defendants came there and committed the depredatio sal-leged in the indictment, then, in law, the said Martin was in sufficient possession, and had sufficient property in said house for the purpose of this indictment."

3rd The business transaction between the said Martin and the elder Smith, can only be considered by the jury in passing the measure of punishment, and is a proper matter of consideration for that purpose; to the giving of which defendants excepted.

Defendants were found guilty, and moved for a new trial for the following reasons:

Smith et al. vs. The State of Missouri.

1. Because the verdict is against evidence, against law and evidence, and against the weight of evidence.

2. The court erred in refusing testimony offered by the defendants, in excluding testimony to which defendants were entitled on a cross examination of the witnesses examined by the State.

3. The court erred in instructions given by it to the jury.

4 The court erred in refusing instructions asked for by defendants.

5. The verdict is in other respects illegal and void.

The court overruled the motion for a new trial, and defendants excepted.


BLENNERHASSETT & SIMMONDS, for appellants.


This instruction (No. 1, as *given* by the court) is illegal in this : that it declares whether Smith and the other defendants had a right or not to pull down the house, yet if the jury believe that it was done by force, &c., they should convict. It may be true, that at the common law, it was a riot to do a lawful act by unlawful means, but our statute has altered the common law in that particular, the 6th section of the riot act making the gravamen of the offence the doing of an unlawful act. It was in this particular that the court was led into the error which it is claimed it committed. The court looked to the common law definition of the offence, without examining our statute on the subject. It may be contended that our statute does not abrogate the common law as to this offence. It may as well be said that our statute defining murder in the 1st degree, justifiable and excusable homicide, and manslaughter, in the four different degrees, does not change the common law definition of murder and manslaughter. The common law is only preserved in the definition of murder in the 2d degree, and then it is done by express enactment. Assuming such a position is assuming nothing less than that our legislature cannot abrogate the common law as to any criminal offence, made such by that law, It is insisted that where our statute defines an offence, that distinction supersedes the offence on the same subject matter created by the common law, and this position is maintained on the general principles of construction. If two statutes be enacted on the same subject, one repugnant to the other, the latter repeals the reformer by implication, without a repealing clause, and the same rule must apply to the common law and a statute. If the common law says that a man taking the life of another by administering poison, shall be guilty of murder in the first degree, and our statute defines murder to be the shooting of another, which is to prevail? In this illustration, it will be seen that what was murder at the common law, is not murder by our statute, and so if the common law declares the doing of a lawful act by unlawful means, or an unlawful act by lawful or unlawful means to be a riot, and the statute omits that part of the definition, to wit : the doing of a lawful act, &c., and only says that the doing of an unlawful act shall be a riot, we are to suppose that the legislature had some object in this omission, and that was to change the common law definition of the offence, and to enact that what would be a riot at common law is so no longer, the statute modifying the offence as it has done in murder, manslaughter, &c. The instruction complained of is in the exact words of the common law definition of a riot. Hawk. P c. b. 1 c. 65, S 1 (1.) Roscoe, p. 726. But this definition is not retained in our criminal code. If such had been the intention of the legislature, the words of the common law definition would have been introduced into the statute, or provision would have been made for the punishment of the offence without defining it, leaving its constituents as they existed at common law. Thus a common barrator may be punished under our statute ; but are we to go back to the common law to ascertain what constitutes barratry ? In a majority of cases, the rules of the common law in relation to the definition of offences, have been modified and changed by our statutes, and in the case of a riot, the distinction between the statutory and common law definition is as clearly drawn as in any other instance. If the statute is to prevail, and this case is to be gov-

Smith et al. vs. The State of Missouri.

erned by its principles, it is contended that the instruction given by the criminal court is erroneous, and that its judgment in consequence thereof should be reversed.

LACKLAND, for the State.

The only questions for our consideration are,

I. Whether the court erred in admitting or rejecting evidence.

II. Whether the court erred in giving or refusing instructions.

The proof shows that Martin had been in actual possession of the land upon which the house in question was situated for about two weeks; at various times during which he, personally, and by his hands employed, had made fence rails thereon, and had erected a house thereon, in possession of which, he (by his hands) had been for two or three days, and defendants assembled, and with force and violence pulled down the house, then set fire to the ruins, to the terror of the hands of Martin then and there being.

If Martin was in possession of the house in question at the time the defendants pulled the same down, without any other title, this is sufficient as against rioters. State vs. John Bennet, 4 Devereaux & Batte, N. C. Law Rep. p. 43.

III. The court did not err in overruling the question asked witness, Walter Adams, as to what Levi Smith said to them about his having purchased the land on which the house stood from Martin. Because it is irrelevant, the only question being, who was in possession according to the above decision. I apprehend the law would not allow a man to commit a riot to the terror of the people in demolishing his own house, if there was no adverse possession.

IV. The court did not err in overruling the question asked the witness, Jno. Carter, by defendants, as to whether others were at work with him, to wit, at the time Smith forbid cutting timber and making rails 1st. Because it assumed a fact to be proven which is proved by the record, to wit: that Smith had prohibited the witness making rails in a certain piece of land. 2nd. Because it has no bearing upon the question of whether Martin was in possession of the house, and defendants with force and violence demolished it.

V. The court did not err in overruling the question as to whether witness, Carter, was the same person sued by Smith in trespass before Music, because it was foreign to the issue; and the same reason is good as to all the questions asked by the defendants counsel in relation to said suit in trespass.

Nor did the court err in refusing to admit the record in the case of Smith vs. witness, Carter et al. for tresp  1st. Because the State is no party to the record. 2d. Because, although the defendants in said suit and Martin may have been trespassers, yet this does not hinder the defendants from being guilty of a riot in demolishing the house. A party may be guilty of a riot in doing a lawful act: i. e. the act done may be lawful, but the manner of doing it constitutes the offence. 1 Iredell, p. 30.

VI. The court did not err in refusing the instruction asked for by the defendants; because all said instructions, except the last, were mere abstract principles, not applicable to this cause, and we do not admit that said instructions (excepting the last) were correct, even if said instruction were applicable.

If the last instruction asked by defendants be good, the same principle is contained in the instructions given by the court.

The court did not err in giving instructions in support of the principles therein contained. See 5 Devereaux & Batte, 43; 1 Iredell, 30.

RYLAND, J., delivered the opinion of the court.

From the above statement, it will be seen that the important question

in this case, arises from the instruction which the court gave to the jury.

This question involves the fact, whether the common law concerning the offence of riot is in force within this State or not.

The legislature of this State at their session in 1824 & '5, in 1834 & '5, and in 1844 & '5, have enacted general provisions upon the subject of riots, routs, &c. And this indictment against Levi Smith and others, is found under the provisions of the act concerning crimes and punishments. Art. 7, sec. 6, of 1844 & '5.

This section does not declare that the act done against its provisions shall be a riot; it does not name the offence otherwise than by stating, that persons guilty under the section shall be guilty of a "misdemeanor, and shall be punished by imprisonment in a county jail not exceeding one year, or by fine not exceeding five hundred dollars, or by both such fine and imprisonment." Yet it is obvious that the subject of riots, routs and unlawful assemblies, was before the minds of the legislators when they were framing this statute. The subject matter has been acted upon by our law-makers. If they had declared that persons guilty of a violation of the provisions of the 6th section of the 7th art. of the aforesaid act of crimes and punishments, passed in 1844 & 5, should be deemed guilty of a riot, there would have been no room for doubting that the common law concerning riots would thereby have been superseded. Nor do I think the omission to call the offence a "riot" can make much difference, since the whole subject matter of the common law offence has been acted upon by our legislature.

We have declared that "punishments, by virtue of the common law, shall in no wise be other than by fine and imprisonment, and such fine shall not exceed one hundred dollars, and such imprisonment shall not exceed two months." See digest of 1845, chap. 100, page 693.

A subsequent statute, revising the whole subject matter of a former one, and evidently intended as a substitute for it, although it contains no express words to that effect, must on the principles of law, as well as in reason and common sense, operate to repeal the former. A statute is impliedly repealed by a subsequent one revising the whole subject matter of the first; and in case of a statute revising the common law, the implication is equally as strong. See Butler vs. King, 12 Mass. Rep. 537; Nicholas vs. Squire, 5 Peck. 168; 10th Pickering, 37; Commonwealth vs. Cooley, 11 Pickering, 350; Commonwealth vs. Marshall and others.

I come to the conclusion, therefore, that whenever the legislature has

made general provisions upon a specific criminal mattter, these provisions are in lieu of the common law.

Let us now apply the principles declared above to the present case.

Here is an indictment under our statute punishing for a misdemeanor. The statute expressly specifies the offence. Its punishment is much greater than what is allowed by our legislature to any mere common law offence.

To justify a conviction therefore upon this indictment, will require more than proof of a common law riot. That is, proof of such acts as would constitute a riot at common law, will not be sufficient to convict under this indictment. It requires proof of an "unlawful act," that is the act done, must only be done in a riotous, routous and unlawful manner, with force and violence, but must be an "unlawful act."

The instruction then which the court gave to the jury in this case and which is set forth in the above statement, as marked number 1, is erroneous. It defines the common law riot; yet tells the jury if they convict the defendants, they must inflict the punishment for the statutory offence, not the punishment for the common law only.

We deem it unnecessary to notice the instructions prayed for by the defendants; if the proof will not support the charge in the indictment that is the statutory offence. We hold that the defendants in that event should be acquitted, for these reasons. It is the opinion of this court that the judgment of the criminal court should be reversed, and this cause remanded, which is done accordingly.