## Albert F. Shannon vs. The People.

Where an indictment contains two counts, each for the same offense, one of which is bad, the other, being good, is sufficient to warrant a general verdict of guilty, and judgment thereon.

An indictment under section 5741 of Compiled Laws, which provides that "If the father or mother of any child, or any other person to whom any such child shall have been confided, shall expose such child in any field, street, house, or other place, with intent wholly to abandon it, he or she shall be punished," &c., must allege either that the defendant was the father or mother of the child, or that it had been confided to him; and this allegation must be sustained by the proof.

To sustain an allegation that such child was confided to the defendant, it is not necessary to show that it was delivered into his immediate manual custody; if it were delivered to some other person employed by him to receive it, and upon the faith of representations made by him to the mother, inducing the belief, on her part, that it would be under his control and direction, this would be confiding the child to him, within the meaning of the statute.

The intent contemplated by section 5741 above quoted, to abandon the child on the part of the person exposing it, has no reference to the probability or improbability of relief to the child from other hands, and is wholly independent of, and does not necessarily imply, an intent to injure. But the exposure, and the intent to abandon, must both concur to complete the offense, and the exposure must be such as may subject the child to the *hazard* of personal injury.

Whether the act be an exposure, within the meaning of the statute, is to be deter-
mined in view of all the surrounding circumstances. If the child be left at such
time, in such place, and under such circumstances, as would render a parent,
or other person (to whom it is confided), of ordinary prudence and humanity,
*reasonably apprehensive of personal injury* to it, then the hazard may be said to
exist, and it is an exposure within the statute; and if it be accompanied with
the intent wholly to abandon, the crime is complete. But if there be no rea-
sonable ground to fear or apprehend that such injury might occur, then the
exposure required by the statute does not exist.

To bring a party within the provisions of section 5741 above quoted, it is not essen-
tial that he should be either the father, mother, or guardian of the child, or one
to whom the child may be bound as an apprentice. Any one receiving the care
and custody of the child, even for a temporary purpose, from a person standing
in either of these relations, would come within the statute as a party to whom
the child was confided.

A person not sustaining towards the child either of the relations specified in said
section, can not be convicted of the principal offense under said section, on proof
of facts showing only that he counseled, or aided and abetted, the commission
of the offense by others.

By section 6065 of Compiled Laws, it is provided that "The distinction between an
accessory before the fact and a principal, and between principals in the first and
second degree, in cases of felony, is abrogated; and all persons concerned in the
commission of a felony, whether they directly commit the act constituting the
offense, or aid and abet in its commission, though not present, may be indicted,
tried, and punished as principals, as in the case of a misdemeanor." In all cases
of felony, where, by the statute creating the offense, or by the existing common
law, only persons of a certain class, or standing in a certain relation, are com-
petent to commit such felony, the indictment against aiders and abettors not
belonging to such class, or standing in such relation, must be under this section,
and must set out the aiding and abetting in which alone the crime consists, and
which, *in such a case*, is the only principal offense within the meaning of this
statute.

*Heard January 7th. Decided May 14th.*

Error to Lenawee Circuit.

The plaintiff in error was convicted at the December Term,
1857, of the Lenawee Circuit, upon an indictment founded on
section 5741 of Compiled Laws, and sentenced to imprison-
ment in the State-prison for five years.

The following is a copy of the indictment:

"State of Michigan: The Circuit Court for the County of
Lenawee. Of the June Term, eighteen hundred and fifty-
seven.

"County of Lenawee, ss.: The Grand Jurors of the Peo-
ple of the State of Michigan, inquiring in and for the body
of the county aforesaid, on their oaths present, that Albert
F. Shannon, on the first day of May, eighteen hundred and

fifty-seven, at the township of Franklin, in the county aforesaid, in a certain highway, then and there did feloniously expose and leave one Hannah Eliza, a female bastard child under the age of six years, to wit, of the age of eight months, which said child had been confided to the said Albert F. Shannon, with intent then and there and thereby wholly to abandon the said child, against the form of the statute in such case made and provided:

"And the jurors aforesaid, upon the oaths aforesaid, do further present that said Albert F. Shannon, on the first day of May, eighteen hundred and fifty-seven, at the said township of Franklin, in the county aforesaid, in a certain highway, did then and there feloniously expose and leave a female bastard child, infant daughter of Martha Thompson, under the age of six years, to wit, of the age of eight months, which said child had been confided to the said Albert F. Shannon, with intent then and there and thereby wholly to abandon the said child, against the form of the statute in such case made and provided.

"R. R. Beecher, Prosecuting Attorney."

The following is an abstract of the bill of exceptions:

Upon the trial of the issue, the Prosecuting Attorney, to maintain the issue on his part, called several witnesses, and gave evidence tending to show, and which he claimed did show, that one William Wells and one Rush M. Greenleaf, on or about the first day of May, 1857, at the instigation of said defendant, applied to one Martha Thompson, the mother of a bastard child under six years of age, named Hannah Eliza, and obtained from her the said child; and that, on the night next following, the said Wells and Greenleaf left the said child in the highway, in the town of Franklin, in said county, with intent wholly to abandon the same; and that the said defendant counseled, abetted, and hired the said Wells and Greenleaf to the commission of the acts aforesaid.

And evidence was also given of certain admissions of the said defendant to Japheth Cross, tending to show that the defendant had agreed with said Wells and Greenleaf to take away said child, but that he expected they would leave it at some place where it would be taken care of. And of certain other admissions of said defendant, made to one Warren Gilbert, tending to show that said defendant had agreed with said Wells and Greenleaf to take away said child; that they were to take it either to Mr. Huff's or Mr. Walker's, make some kind of noise, and leave the child at the door.

And after the testimony was closed, the counsel for the defendant prayed the said Circuit Judge to charge the jury,—

1. That, to sustain this indictment, it must appear that the child was confided to the defendant; that if it was confided to any other person or persons, and not to the defendant, the defendant must be acquitted.

2. That if the child was not confided to the defendant himself, and he was not present when it was confided to another person or persons, who abandoned it, he can not be convicted upon this indictment, even if the jury should find that he was accessory to the same before the fact, or counseled or incited the commission of such offense.

3. That if the jury believe that the defendant expected the child would be left where it would be taken care of, this would not be such an exposure of the child as the statute contemplates, and would not constitute the offense charged in the indictment.

4. That if the jury believe that the defendant agreed with the men who abandoned the child to take it to some house, and leave it at the door, and then to make a noise, so as to call the attention of the inmates of the house to the child, with the reasonable expectation that the child would be taken care of by them, this would not be such an exposure of the child as the statute contemplates, and would not constitute the offense charged in the indictment, and the defendant must be acquitted.

5. That no person can be convicted under section 31 of chapter 153 of the Revised Statutes of 1846, unless the person who abandons the child is either naturally or legally bound to take care of it; and that the person who counsels or hires any one to commit such an offense must have the same relation to the child.

But the Circuit Judge refused to charge as so requested, upon each and all the several points above mentioned; and, on the contrary, charged the jury that it was perfectly immaterial whether the child was left in a house, where it would be certain to be cared for, or in the street, where it would not be cared for, provided the prisoner intended himself to abandon it.

To which several refusals of the Circuit Judge to charge as requested, and to the charge so given, the counsel for the defendant excepted.

And the Circuit Judge further charged the jury, that, if they believed from the evidence that the prisoner believed that Wells and Greenleaf had made an. arrangement with Huff or any other person to take the child and provide for its welfare, and that they were only authorized or procured by the prisoner to take the child where it would be thus cared for, that then they should render a verdict of "not guilty"; but if the jury believed that the prisoner induced the mother to confide the child to Wells for the purpose of abandonment, to be left either at the door of a house, or by the wayside, then they should render a verdict of "guilty."

The Circuit Judge further charged the jury as follows:

"The object of the statute is two-fold:

"1st. To induce, if not compel, every parent, or guardian of a child, and every person to whom the care of a child may be confided, to take proper care of it:

"2d. To protect persons, not parents or guardians, and every person to whom the care of a child may be confided, from being burdened with the care and custody of children:

"Therefore, I charge you, that if it was agreed that this child was to be left at a door sill of a dwelling-house, and an alarm given, whereby the child would be probably or certainly taken care of, and probably provided for, yet the crime of abandonment was complete the moment the child was thus left, and the death of the child adds nothing to the character of the offense."

To which opinion and direction the counsel for the prisoner then and there excepted.

After allowance and signing of the exceptions, the cause was brought to this Court by writ of error.

*A. L. Millerd*, for plaintiff in error:

1. The indictment charged that the child was confided to defendant. This was not sustained by proof that it was confided to some one else, and that defendant was accessory to its abandonment. The statute of 1855, page 145, § 19,* does not obviate this objection, but simply places felonies on the same footing as misdemeanors and treason. The general form of indictment against one who directly commits the offense, is not applicable to, and will not answer in, all cases against those who counsel, aid, and abet the same. In certain cases, the indictment must be *specially framed*, in order to conform to the facts.— 1 *Ch. Cr. Law*, 66; 1 *Wat. Arch.* 96–2, *Note; United States vs. Mills*, 7 *Pet.* 138.

To hold that this statute authorized the same form of indictment to be used in all cases against those who counsel and abet the commission of a crime, as against those who directly commit it, would, in many cases, lead to the greatest absurdity; as in the case of a woman counseling and abetting a man to commit adultery with another woman; or accessory to the offense of a man abducting a woman, or compeling her to marry him, or be defiled; or in cases of bigamy, embezzlement, and other offenses which can be directly

*Sec. 6065 of Compiled Laws.

committed only by persons sustaining a *purticular character or relation.*

True, it has been held that an accessory to the crime of rape may be indicted in the same form as the principal; but this is the distinction: So far as the statement *of the commission of the offense* is concerned, by fiction of law the one who aids and abets another in committing it, is considered as doing it himself; not so, however, with *the description of the character or relation* of the person, where a certain offense can only be committed, directly, by one sustaining a particular character or relation. This character or relation is not an *offense*, but is necessary to the offense; and it must be stated according to the fact.

There is no fiction of law which can regard one as the father or mother of the child, who is not so in fact; or as having it confided to him, when such is not the fact. The evidence must sustain the indictment in this respect. — *Wat. Arch.* 79; *Ibid.* 96–1, *and Note* 2; *Regina vs. Bird,* 2 *C. & K.* 817; *Rex vs. Douglass,* 7 *C. & P.* 644.

2. Leaving a child in a place, with an intention that it should be, and a reasonable expectation that it would be, taken care of, would not constitute the offense which the statute intends to punish. The *terms* used in the statute— "*expose* and *abandon*"— can only be satisfied by leaving the child in a situation of *danger*, where it will be likely to perish or suffer for want of care. The crime against which the statute is aimed is, inhumanly leaving a child exposed to suffering and death.

3. The second count in the indictment is bad, because it does not give the proper name of the child, nor state it to have been to the jurors unknown; and the first, because it only gives the christian name. — *Wat. Arch.* 79, *et seq.* The verdict being general, the judgment should be reversed if there is one bad count.

*J. M. Howard, Attorney General,* for the People.

SHANNON *vs.* THE PEOPLE.

*R. R. Beecher, Prosecuting Attorney of Lenawee County,* submitted a brief on the same side, contending that the common law distinction between principal and accessory having been abrogated by statute, defendant was correctly charged as principal in the indictment.—*Baxter vs. The People,* 3 *Gilm.* 368; *Brennan vs. The People,* 15 *Illinois,* 511; *Bonsell vs. United States,* 1 *Iowa,* 111.

There is now no such thing known to our laws as an accessory before the fact; and if defendant could not be indicted as principal, he is not punishable at all.

Is there any difficulty in charging accessories before the fact as principals in all cases? A man who is accessory to self-murder may properly be charged as principal in it; and this, either by setting out the special facts which constitute him a principal under the statute, or by charging him with the principal offense, in the usual form.— *Com. vs. Bowen,* 13 *Mass.* 356; *Reg. vs. Leddington,* 9 *C. & P.* 79; *Rex. vs. Dyson, Russ. & Ry.* 523. And so in case of rape by one of several accessories; all may be charged with having committed the offense, though it can be committed by one only.—*Dennis vs. The State,* 5 *Ark.* 230; 2 *Arch. Cr. Pl. 6th Ed.* 307–14 and 15.

2. The statute under which defendant was indicted, was evidently intended to check the tendency to abandon young children by parents and others who had no other restraint upon their conduct. The word *expose,* it seems to us, means " cast out to chance," or cast off the care and protection of the child, with intent wholly to abandon. It is aimed at those who, having the care of helpless infancy, shall expose the same to the charities of others; to cold, want, pain;— who shall, in short, submit it to any exposure with intent wholly to abandon it, however near or remote may be the probabilities of its being cared for and provided with necessaries. It is intended, also, to protect every member of society from being burdened against his will with the care and responsibility of other people's children. And he who steals

SHANNON vs. THE PEOPLE.

up to his neighbor's house, with a young child in a basket, and hangs the same on the knob of the door, and rings the bell; or places the child in a room, where its cries will bring it aid and assistance; is equally guilty, under this Act, with him who makes a more open and dangerous exposure.

CHRISTIANCY J.:

The errors assigned in this case are substantially as follows:

1. The insufficiency of the indictment.

2. The refusal of the Court to charge the jury as requested in each of the points specified in the bill of exceptions, and the charge actually given, as far as excepted to.

3. That the second count of the indictment is insufficient, in not giving the proper name of the child, nor otherwise sufficiently designating it; and, under this, it is contended that as the verdict and judgment are general, the judgment should be reversed, because one count is defective.

The first and third grounds of error relate to the indictment: the first is general in its terms, and points to no specific defect; and none was urged upon the argument under this head, except that the indictment charges the defendant directly with the commission of the offense, and was not, therefore, appropriate to a case where the offense was committed by the hand of another, and the defendant was only connected with the offense by counseling, hiring, and abetting.

Now, it is quite evident that this is not properly an objection to the form or validity of the indictment, but an indirect mode of objecting to the propriety or sufficiency of the evidence offered in its support, or to a variance between the indictment and the proof. The objection in this form clearly admits the sufficiency of the indictment if sustained by proper and adequate evidence: it does not appear upon the face of the indictment, and can only be made apparent by bill of exceptions. We will, therefore, defer the consideration of this point until we come to the exceptions.

The second error assigned relates entirely to the second count; and as this was a bastard child, only eight months old, and could only have a name by reputation or baptism, and does not take the name of the mother, unless gained by reputation (*Reg. vs. Clark, Russ. & Ry.* 358; *Rex vs. Waters,* 1 *Moody C. C.* 457; *Reg. vs. Stroud,* 1 *C. & K.* 187), and can have no name by reputation as soon as born (*Coke Lit.* 36), and the absence of a name is sufficiently accounted for (without stating it to be unknown), when described as "then lately born" (*Reg. vs. Hogg,* 2 *M. & Rob.* 380; and see *Reg. vs. Willis,* 1 *Car. & K.* 722), and if a month old, and actually baptised by a christian name, can not be described as unknown (*case last cited*), and the mother calling it by a certain christian name would not give it that name by reputation (*Reg. vs. Smith,* 1 *Moody C. C.* 402), it would seem not to be very clearly settled how "lately" a bastard child must be born, to avoid the necessity of naming it or describing it as unknown.   A bastard child eight months old is, perhaps, rather young to be presumed to have acquired a name by reputation; and the baptism of even legitimate children is not so universal in this country as to authorize its presumption without proof. But we wish to be understood as giving no opinion in reference to the objection to this count, since we deem it wholly unnecessary to the decision of the cause.   If this count were clearly defective, the first being good is sufficient to warrant the verdict and judgment, if no other error appear in the cause.   Such is the course of decisions in all the States of the Union, where the question has arisen, except Virginia.—See *Wharton's Cr. Law,* 2d *Ed.* 864, and authorities there cited.   Such was also the uniform course of decisions in England, from the earliest times down to a very recent period (1 *Chitty's Cr. Law,* 4th *Amer. Ed.* 700), when it was overturned, for a time at least, by the House of Lords in the great State Case of the *Queen vs. O'Connel.*   But, in estimating the credit due to this decision, we should not forget that the House of

Lords is a political body with judicial powers; that the case was one which, under the guise of a judicial proceeding, is generally believed to have involved questions (in the opinion of that body) of greater political than judicial consequence; that the administration in power sought the result which ensued upon that decision, as the only mode of escape from an embarrassing position; and that the decision has failed to command the respect of the profession, and can scarcely sustain itself in their own courts.—See 3 *English L. & Eq. R.* 23. Such a decision, in any country, by a court so constituted, and under such circumstances, especially when it overturns the long-settled law of the land, must be viewed as a very unsafe precedent, and can scarcely be expected to command the respect usually accorded to judicial decisions, beyond the sphere of the legal power of the court to enforce such respect.

The indictment then is sufficient to warrant the verdict and judgment, if it has been sustained by the evidence, and if no error appear in the proceedings.

We come, therefore, to the exceptions; and the best mode of considering these will be to refer to the statute on which the indictment is founded, and which defines the principal offense. This statute is in the following words: "If the father or mother of any child under the age of six years, or any person to whom such child shall have been confided, shall expose such child in any street, field, house, or other place, with the intent wholly to abandon it, he or she shall be punished by imprisonment in the State-prison not more than ten years."—*R. S.* 1846, *Chap.* 153, *Sec.* 31; 2 *Compiled Laws of* 1857, *Sec.* 5741.

Now it must be manifest that an indictment, in order to bring an offender within this section, must allege (as this indictment has done), either that the defendant was the "father" or "mother" of the child, or that it had been "confided" to him; otherwise, it would be clearly bad on demurrer, as no other person can, by legal possibility, commit the offense

5 Mich.—F.

created by this section.—*Arch. Cr. Pl. by Waterman,* 85–2 *and* 86. If it be necessary to allege this in the indictment, to bring the defendant within the statute, it must be equally necessary, and for the same purpose, to prove it when alleged. —2 *Hawk. c.* 25, *sec.* 112; *Arch. Cr. Pl.* 79. If the defendant in this case had been charged as the father of the child, no one would have doubted the necessity of such proof; had he been charged as the mother, if the error did not sufficiently ·appear on the indictment, it would at least have demanded the most cogent proof. Now, it is just as necessary to prove the relation mentioned in this indictment, as either of the others.

It may be laid down as a. safe general rule, That any allegation necessary to bring an offense or an offender within a statute, must be substantially proved as alleged. Possibly there may be some peculiar cases, where such allegation might be presumed, or the onus of disproving it thrown upon the defendants; but such cases must be extremely rare, and this certainly is not one of them.

We do not mean to assert that, in this case, it would have been necessary to show that the child was delivered into the immediate manual custody of the defendant; if it were delivered to some other person employed by him to receive it, and upon the strength of representations made by him to the mother, inducing the belief, on her part, that it would be under his control and direction;—in short, if the *confidence* were reposed in *him, rather* than in the *agent* who actually received it, this would be confiding the child to him within the meaning of the statute. But, whether it was confided to the defendant in this or any other manner, was a question of fact for the jury, and, until they had settled this question in the affirmative, they could not legally convict the prisoner under this section or this indictment.

The Court were so requested to charge the jury, but this request was refused; and this question does not appear to have been submitted to the jury in any form or manner

whatever. Hence, the first exception is well taken, and is decisive of the cause.

But, as there are other important questions presented by the exceptions, arising under statutes which have not yet received a judicial construction in this State, and as these may arise again, under the same, or another indictment, growing out of this transaction, it may be well to notice them here.

The second point upon which the Court was requested to charge, though very loosely expressed, and confounding other questions with the point, may yet, we think, be said to raise the question, Whether, under this indictment, the defendant can be convicted by proof of facts showing only that he counseled, or aided and abetted the commission of the offense by others?

To determine this question, it becomes necessary to refer to our statutes fixing the grades of crime and the mode of prosecution against principals, aiders and abettors, or accessories.

Section 18, chapter 161, Revised Statutes 1846,* provides that the "term felony, when used in this title, or any other statute, shall be construed to mean an offense for which the offender, on conviction, shall be liable by law to be punished by death or by imprisonment in the State-prison." The effect of this section, when taken in connection with sections one and two of the same chapter, and with section nine, chapter 169, Revised Statutes,† is, we think, to make all offenses felony which are punishable by imprisonment in the State-prison.— See *People vs. Brigham et al. 2 Mich.* 550. And the term "felony" in the Act of 1855, next to be noticed, we think must also be construed to have reference to the provisions of section 18, above quoted.

The principal offense, then, provided for in section 31, chapter 153, and for which the defendant in this case was indicted, is a felony.

*Sec. 5954 of Compiled Laws. †Sec. 6076 of Compiled Laws.

The Act of 1855, section 19,* enacts "that the distinction between an accessory before the fact and a principal, and between principals in the first and second degree, in cases of felony, is abrogated; and all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, may hereafter be indicted, tried, and punished as principals, as in the case of a misdemeanor." This section is a rather distant imitation of the English statute, 11 and 12 *Victoria, Chapter* 46, *Section* 1 (*Arch. Cr. Pl. by Waterman,* 15 *and* 16). But the English statute did not abolish the distinction between principals and accessories, and therefore left in full force the statute, 7 *George IV., Chapter* 64, *Section* 9 (*Waterman's Arch.* 16) from which the provisions of our statute, sections one and two, chapter 161, were substantially copied. The terms "aid and abet, though not present," as used in our statute, section 19, appear, from the context, to be used in an enlarged sense, including all which go to constitute an accessory before the fact at common law.—See 1 *Russ. Cr. Law,* 6th *Amer. Ed.* 31, 32; *Jacob's Law Dictionary, title "Aider and Abettor."*

We think, therefore, the effect of this section is to repeal sections one and two, chapter 161, Revised Statutes, which provided that accessories before the fact, in felony, by counseling, hiring, procuring, &c., should be punished in the same manner as the principal felon, and that they might be indicted and convicted as accessories before the fact, or for a substantive felony, whether the principal felon should have been convicted or not, &c.; because this section 19 abolishes the distinction between principals and accessories before the fact in felony— a distinction upon which sections one and two, above cited, mainly, if not entirely depend. This section 19 of the Act of 1855, is repugnant to sections one and two in everything which depends upon the distinction formerly existing between

* Laws of 1855, p. 145; Sec. 6065 of Compiled Laws.

principals and accessories in such cases. It might be a very nice question to determine whether there is any repugnancy, first, between this section and the provision of section one, making the person who shall aid in the commission of a felony punishable in the same manner as the principal felon; and, second, the provision of section two, making those who counsel, hire, or procure, liable to be convicted of a substantive felony; but in both these respects, if there is no repugnance, it is because of their *identity*, in effect, with like provisions in section 19 of the Act of 1855; and we think, therefore, in such a case at least, the rule ought to apply, "That where a subsequent statute covers the whole ground occupied by an earlier statute, it repeals, by implication, the former statute, though there be no repugnance."— *Commonwealth vs. Cooley,* 10 *Pick.* 37; *Goodnow vs. Buttrick,* 7 *Mass.* 140; *Bartlett vs. King,* 12 *Mass.* 537, 545; *Ashly, appellant,* 4 *Pick.* 21, 23; and see 1 *Pick.* 452; *Ibid.* 43, 45; 17 *Ibid.* 80; 5 *Ibid.* 168; 3 *Cush.* 150; *Towle vs. Marrett,* 3 *Greenl.* 22; *Commonwealth vs. Cromley,* 1 *Ashm.* 179; and see 3 *Binney,* 595, 597; 13 *S. & R.* 426; *State vs. Whitworth,* 8 *Porter,* 434; *Smith vs. State,* 1 *Stew.* 506; *State vs. Seaborn,* 4 *Dev.* 305, 310; *Dugan vs. Gittings,* 3 *Gill,* 138; *Smith vs. State,* 14 *Mo.* 147; *Bryan vs. Sundberg,* 5 *Texas,* 418; *Leighton vs. Walker,* 9 *N. H.* 59; *Bishop on Cr. Law, Sec.* 92 (an excellent work).

The only statutes, then, which can affect the prisoner in the case before us, are section 31, chapter 153, upon which the indictment is founded, and section 19 of Act of 1855; and, as the offense created by section 31 was not an offense at common law, it follows that, unless he comes within one or the other of these statutes, he has committed no offense known to the law.

We have already seen that to constitute a principal offender under section 31, he must sustain towards the child one of the three relations mentioned in that section; viz., he must be either the father, or mother, or a person to whom the child has been confided; as the exposing the child, with intent

to abandon, by any other person, is not rendered criminal by this section, even in a principal; much less an aider and abettor, who is not even mentioned in the section. And as there can be no accessory, as a common law incident of a statute felony, since that incident has been abolished by the statute of 1855, it follows that no person, not sustaining one of these relations to the child, can be convicted for counseling, aiding, and abetting in the commission of the offense, either as a principal, or an accessory under section 31, or as accessory at common law.

Hence, as the commission of the principal offense by any person not sustaining one of these relations is legally impossible, he must be guilty, if at all, as an aider and abettor; and, in such case, his guilt will consist *solely in the aiding and abetting;* which, therefore, in a case of this kind, and since accessories are abolished, must be a substantive offense, or no offense at all.

Has, then, the statute of 1855, section 19 (the only remaining statute applicable to the subject), rendered such aiding and abetting criminal in one not present, and provided for its punishment? This Act provides that all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid and abet in its commission, though not present, may hereafter be indicted, tried, and punished as principals, as in the case of a misdemeanor. This, then, clearly renders all aiding and abetting in felony, though by persons not present, criminal, and prescribes the punishment, as in the case of the principal. And under this section, such aider and abettor may be convicted and punished, though not sustaining the relation necessary to bring him within the description of a principal offender under section 31, chapter 153. But to bring such a person within this section (19), he must be indicted *under it,* since it is the only law which renders him criminal; and as the offense, in such a case, consists *solely* in the *aiding and abetting,* these circumstances must be alleged in the indictment, or the offense.

does not appear. He must be indicted under the statute which he has violated, and not under that which he did not violate. But it is contended by the prosecution that it was the intention of section 19, of Act of 1855, to provide that, in all cases, an aider and abettor might be indicted directly as committing the principal offense, in the commission of which he had aided and abetted, without requiring the aiding and abetting to be set out in the indictment; and that the last clause of the section, " as in case of a misdemeanor," clearly shows this intent. It is true that such is the general rule in misdemeanors (see *Bishop on Cr. Law*, § 483, and authorities there cited); and in misdemeanors generally, aiders and abettors, if guilty at all, are guilty as principals. But even, in a case of misdemeanor, if the person indicted can not legally be guilty as a principal, as is sometimes the case where the principal offense can only be committed by a certain class of persons (and the defendant does not come within that class), he can not be indicted as a principal where he only becomes guilty by the aiding and abetting; but if indictable at all, he must be indicted specifically for the aiding and abetting, as a substantive offense. This must be so in the nature of things, if there were no authorities to support it. But we are not without authority upon the point. Thus, the statute of 9 *George IV.*, *Chap.* 31, *Sec.* 14, provided that if the mother of a bastard child should, by certain means therein stated, endeavor to conceal the birth thereof, she should be guilty of a misdemeanor, and punished in the manner therein provided; and section 31 of the same chapter provided that any person who should " counsel, aid, and abet the commission of such misdemeanor, should be liable to be proceeded against and punished as a principal offender.—See the statute in the Addenda to 2 *Russ. on Cr.* A man who had aided and abetted the mother in the commission of the offense, was indicted as a principal under section 14; but the Court held that he could not be convicted under that section, but that he might be convicted on

an indictment, under section 31.— *Rex vs. Douglass et al.*
7 *C. & P.* 644; and see *Reg. vs. Bird,* 2 *C. & K.* 817.   In
cases of this kind, then, the provision of this section, that
aiders and abettors may be indicted "as principals," can not
be construed to mean that they may be indicted as having
directly committed the principal offense, in the commission of
which they have aided and abetted only; especially in a case
like the present, where, if the defendant had *directly* com-
mitted the very act constituting the offense, he would not
be guilty.   It can only receive this construction, if at all,
in those cases where it was *legally possible* for the defendant
to commit *directly* the *principal offense.*

It is too apparent that such a construction as contended
for, in a case of this kind, tends to absurdity, and ends in
impossibility; it must, therefore, be rejected.   The statute,
we think, admits (and in this class of cases requires) a more
reasonable construction, and one which will effect its real
purpose of holding aiders and abettors to a criminal responsi-
bility as substantive offenders.   What constitutes the principal
offense of an aider and abettor not present, under this section?
Clearly, in a case of this kind, it consists solely in the aiding
and abetting.   Hence, an indictment which charges him with
the aiding and abetting, charges him as a principal, and of
the only principal, or legally possible, offense which he can
commit.   The case would be substantially met by an indict-
ment for a substantive felony, similar in form to one framed
under the statute 7 *George IV., Chap.* 64, *Sec.* 9, from which
section 2, chapter 161, of our Revised Statutes was substan-
tially copied.   For such an indictment see *Arch. Cr. Pl., 5th
American Ed.* 690; and see 1 *C. & M.* 200.

These considerations lead us inevitably to the conclusion,
That in all cases of felony, where, by the statute creating
the principal offense, or the existing common law, only per-
sons of a certain class, or standing in a certain relation, are
competent to commit such principal offense, the indictment
against aiders and abettors, not belonging to such class, or

standing in such relation, must be under this section, and must set out the aiding and abetting, in which alone the crime consists.   This rule will apply to several classes of crime: such, for instance, as embezzlement; the making of fraudulent receipts by warehousemen; any malversation in office; adultery, incest, &c.

In cases of felony generally, where the commission of the principal offense is not confined to persons of a certain class, or sustaining a particular relation, the reasons above given for the conclusions at which we have arrived, do not necessarily apply; and we do not wish to be understood as expressing any opinion as to the validity of this direct form of indictment against aiders and abettors not present, in such cases: but, as the constitutional power of the Legislature to authorize this form of indictment in such cases has been seriously questioned (see dissenting opinion of Kœrner J. in *Baxter vs. People of Illinois*, 3 *Gilm.* 368); and especially since it is much more fair and liberal towards a defendant to set out in the indictment the facts of his aiding and abetting, so as to inform him of the nature of the evidence to be adduced against him, and the statute in question will clearly admit of this latter form of indictment, we can not but deem it the safer and better form.

Another important question is presented by the exceptions and the charge, viz., What constitutes the offense of " exposing with the intent wholly to abandon," within the meaning of section 31, chapter 153?*   No difficulty can arise upon the words relating to the intent.   It is obvious that the term " abandon" is here used in its ordinary sense, — to forsake, to leave without the intention to return to, to renounce all care or protection of.   It refers only to the intention of the party as connected with his own act, not the acts of others. The intent to abandon, therefore, on the part of the person exposing the child, has no reference to the probability or improbability of relief to the child from other hands: this

* Sec. 5741 of Compiled Laws.

intent is wholly independent of, and does not necessarily imply, an intent to injure. But to "expose" the child is the substantive act—the "intent to abandon" is the secondary ingredient; both must concur to complete the offense. The difficulty arises upon the word "expose"; and what shall be said to be a sufficient exposure of the child to bring the act within the prohibition of this section, is a question of some difficulty. The term "expose," in such a connection, does not appear to have become a legal term, the meaning of which is settled by judicial decision, either in this country or in England. This section substantially was first adopted as a new provision in the *New York Revised Statutes* (vol. 2, p. 665, Sec. 35), from which it was copied into ours; and we do not find that it has ever received a judicial construction in that State. The question is, therefore, now presented for the first time for adjudication, and we are compelled to seek for its meaning in the general popular sense of the term, the context, the subject-matter, and what we may deem to have been the occasion and design of the statute.

The following definitions of the word, as given by Webster, sufficiently express the general sense of the term:— "To remove from shelter; to place in a situation to be affected or acted on." *In reference to pain*, "To make liable"; "to subject"; and (referring to the custom of some nations to expose their children) "to cast out to chance; to place abroad, or in a situation unprotected." And see Encyclopædia Britannica, Edinburgh Ed. of 1797, title "*Exposing*," where it is said (speaking of this custom among the ancients), "The places where it was usual to expose children were such as people frequented most. This was done in order that they might be found, and taken up by compassionate persons, who were in circumstances to be at the expense of their education. With this intention, the Egyptians and Romans chose the banks of rivers, and the Greeks the highways." The connection in which this section stands in our statute, in the chapter entitled "*Of Offenses against the Lives and Persons*

*of Individuals*," as well as the severity of the punishment, we think very clearly indicate that the exposure contemplated by this section must be such as may subject the child to hazard of personal injury—such as may peril the life or health of the child, or produce severe suffering or serious bodily harm: and, hence, that to leave a child, with the intent wholly to abandon it, "in a house [or other place] where it would be certain to be cared for," would not constitute the exposure contemplated by the statute. We can not suppose the Legislature intended to inflict so severe a punishment, to protect "persons not parents or guardians from being burdened with the care and custody of children," if they choose to assume that care and custody, or, in other words, from an unexpected demand upon their benevolence, from which they might rid themselves at any time by applying to the officers having charge of the poor. Such severity, for such a purpose, would be unprecedented in the history of legislation. On the other hand, it is perfectly clear that no actual injury need ensue from the exposure.

We may find some aid in arriving at the legislative intent, by reference to the common law, as it existed prior to the statute, and the defects, if any, sought to be remedied.

At common law, the exposure of a child, with intent to abandon, was no offense, unless injury to the child actually ensued; and then the crime was measured by the event: in other words, the common law punished *only* the *injury*, not the *exposure* to, or *hazard* of, the injury.—*Reg. vs. Hogan*, 5 *Eng. L. & Eq. R.* 553; *Reg. vs. Renshaw*, 20 *Ibid.* 593; *Ibid.* 591; 1 *Bishop Cr. Law, Sec.* 413. But, it was often difficult to determine whether the injury in a given case was the result of the exposure, or of some other cause; besides, this remedy, after the mischief was done, came too late. The object of the statute obviously was to meet the exposure to injury *in limine;* to prevent the hazard of injury, and to punish as a crime the act creating the hazard.

The question, therefore, upon this point, is simply this:

Did the acts of the party leaving or abandoning the child, viewed in connection with the time, place, and all the accompanying and surrounding circumstances, subject the child to the hazard of such personal injury? If so, this is an exposure. The law can not enumerate the chances, nor fix upon any *degree* of risk as the dividing line between impunity and crime. And any rule, based upon an attempted distinction of this kind would be clearly giving impunity to crime, or be so vague as to be wholly unintelligible. To illustrate (and it is but an illustration, for the question does not admit of arithmetical solution), shall we say the chances of injury must exceed the chances of safety? This might be partially intelligible, but would it be just and consistent with the protection which the law should extend to helpless infancy? This would be to hold that a party might innocently (though with the criminal intent to abandon) subject the child to fifty chances of injury, to which it would not otherwise have been liable, so that he should leave it an equal number of chances for safety; yet none of these fifty chances of injury would have existed but for the party's criminal act: he can not, therefore, be credited with the fifty chances of safety, for these, and fifty more, would have belonged to the child, if he had simply performed his legal and moral duty of care and protection. These fifty chances of injury, therefore, are so much positive crime — so much actual exposure within the statute. But, shall we say a decided preponderance of probabilities in favor of safety shall exonerate the prisoner? — say ninety chances of safety, and only ten of injury? Still, can a party, with the inhuman purpose of abandonment, innocently subject the child to the risk of these ten chances of injury, which would not otherwise exist? Will the law permit parties to hazard the life or health of infants, even as a matter of amusement, upon a mere game of chance, otherwise innocent, though the chances might be nine out of ten in its favor? If not, then much less can it be permitted when the purpose is not only criminal but inhuman. To admit

such a principle would be a reproach to the laws and the civilization of the age. The law can recognize no degree of hazard, thus created, as void of criminality. We do not intend, by this, to say that a bare *possibility* of injury would constitute the exposure; but the only safe and practical rule upon this point, we think, is this: If, from the time, place, and manner of leaving the child—its age, dress, the state of the weather, and all the circumstances surrounding and accompanying the transaction—the jury shall believe that there was reasonable ground to apprehend, or fear, that such injury might thereby happen to the child, then, if accompanied with the intent wholly to abandon, it is an exposure within the statute, and the crime is complete: but if, judging from the like premises, there was no reasonable ground to fear or apprehend that such injury might occur, then the exposure required by the statute did not exist. This may be rendered more definite by saying, That if the child be left at such a time, in such a place, and under such circumstances, as would render a parent, or other person (to whom it is confided) of ordinary prudence and humanity, reasonably apprehensive of such injury to the child, then the hazard may be said to exist, and it is an exposure within the statute.

The question, How far the prisoner is to be held responsible for the acts of Wells and Greenleaf, his agents, in leaving the child at a different place or in a different manner from that which he had advised or directed? will depend upon the question, Whether, if left at the place, or in the manner he directed, it would have constituted the offense? If so, he would be guilty of aiding and abetting the offense, though they may have varied from the instructions, as to the place, manner, and circumstances of leaving the child.—See 1 *Russ on Cr.* 6*th Amer. Ed.* 34, 35. If the defendant had previously made an arrangement with any of the inmates of a house, at which it was to be left, to receive it, and if, in pursuance of that arrangement, Wells and Greenleaf were directed to leave it at the time and place agreed on; or, if

they had been directed to leave it in the basket of a found-ling-hospital, where, from the known regulations of such in-stitutions, some person is always, or at stated hours, on the watch to receive such a trust;—in either of these cases, if they were directed to observe proper precautions for its safety, the defendant would not be guilty, though the parties might have varied from his instructions, and exposed the child; be-cause, here was a reasonable certainty of safety, if his in-structions had been followed—such a transaction would be a rightful transfer of the care and custody of the child, and not an exposure or abandonment.

But, it seems to have been assumed by defendant's coun-sel, as appears by the fourth point of his request to charge, when taken in connection with the evidence (and it is only in connection with the evidence that any request can be proper), that to leave a child, at night (with the intent wholly to abandon it), at the door of a stranger, without any previous arrangement with, or intimation to, any of the inmates—making an alarm at the door, and then coming away, without waiting to see whether the alarm would be heard or heeded, or the child discovered or received—might furnish ground for a reasonable expectation of defendant that the child would be taken care of by the inmates; and that, if he had such reasonable expectation, this would not be such an exposure as the statute contemplates.  This point, we think, is fallacious on two grounds: *First*, it admits, like every other point taken by the defendant's counsel, the intent wholly to abandon the child before placing it in the actual or constructive care or custody of any other person—in other words, to abandon it to chance.  This does not seem to be denied; yet this is the *only* criminal *intent* required by the statute—the only question of intent involved in the issue. This intent being admitted, the whole question turns upon the point, Whether the leaving of the child according to directions of the defendant, would have been an exposure?— in other words, Whether it would have been subjected to

the *risk* of injury?—and this must depend again upon all the surrounding circumstances. Now, these circumstances, and consequently the question of hazard or exposure, can in *no way* be *affected* by the *expectations* of the defendant one way or the other. If this were an indictment at common law for the injury actually resulting from the exposure, then the expectations of the defendant might be very material, as bearing upon the question of intent to injure, or as showing malice, express or implied; but here, no such intent is in issue—no intent but the intent to abandon.

But, *Secondly,* the defendant's fourth point is fallacious in assuming that, in abandoning a child, a party has a right, without previous arrangement or other special ground, to presume that the child will be discovered, and protected by strangers who are under no legal or moral obligations of that kind more than the world at large. We speak here only of the case of a child wholly incapable of protecting itself, or making known its wants, as in the present case; for a child eight months old is as powerless of self-protection as one of eight days. By the common understanding of all civilized nations, it is essential to the health, comfort, and safety of such a child, that it should at no time be without the watchful care and guardianship of some person who shall be responsible for its welfare: left to itself, it must, in a short time, suffer and perish.

This care and protection of infants is one of the most sacred duties imposed upon man by his Maker; and the law is solicitous, in various ways, to enforce the performance of this duty. No parent, or other person entrusted with the custody and protection of helpless infancy, can be permitted to divest himself of the responsibility which this trust imposes, until that custody and protection have been committed to or assumed by other hands. And if, in the attempt to throw off the responsibility, he abandons the child, he must be required first to see that there is at least a reasonable certainty that some other person will assume it before the

risk of injury shall occur from the abandonment; he must be held to the highest degree of diligence. The safety of a human being depends upon his acts. The law extends its protection only to acts which are legal; he is in the performance of an illegal act — he has renounced the protection of the law, and must look to his own acts and his own diligence alone to protect him from criminal responsibility.

The defendant has no right to presume, and the Court can not presume, that a stranger, under no legal or natural obligation, will, out of mere benevolence, burden himself with the care and protection of the child, when those who are under the strongest obligations, human and divine, have abandoned it to chance. Can the law hold mere strangers, or passers-by, to criminal responsibility for neglecting it, when discovered? If so, shall it be the first who discovers it, and who, with the kindest wishes, and hopes as good as the defendant's, leaves it to the next? or the second, who leaves it to the third? The defendant might hope, and for the honor of humanity we should also hope, the child might find succor and protection even from strangers; but this hope can not be admitted as a presumption, nor of itself operate as a defense, though it might perhaps mitigate the enormity of the offense, and very properly be taken into consideration, by the Court, in awarding the penalty; and the ample range of punishment allowed, from ten years down to a few months in the State-prison, gives full scope for the exercise of a lenient and just discrimination in such cases.

A party, seeking to abandon a child, and with that intent leaving it at night, even at the door of a stranger's dwelling, without previous arrangement or notice, should not be satisfied with ringing the bell, or making an alarm at the door, and then leaving the child to the chances which may befall it, without waiting to learn whether the alarm will be heard or heeded, or whether the child will be discovered, or, if discovered, taken in charge. He should remain within view, or within the hearing of its cries, until he sees that it

has found the protection of another; and if that protection does not come in time to prevent danger, he should resume it himself, and trust to a future and more propitious effort — any time will be early enough to commit crime. But if, in the execution of his criminal purpose, he neglect all these precautions, he must, at his peril, take care that it be under circumstances which do not subject the child to the *hazard* of injury. It may perhaps be difficult to define, in advance, any state of such circumstances, void of hazard to so young a child, when all such precautions are neglected; as, in such case, it would seem the only hope for its safety must be a reliance upon the benevolence of others who are under no legal obligation to protect it. But we do not say that circumstances might not exist, even in such a case, which would render the child safe from the hazard of injury. It is a question of fact, for the good sense of a jury, under the rule of law above laid down.

As to the fifth point taken by the defendant in his request to charge, we do not think it essential to bring a party within section 31, chapter 153, that he should be either the father, mother, or guardian of the child, nor one to whom a child may be bound or apprenticed; but that any person receiving the care and custody of the child, even for a temporary purpose, from a person standing in either of those relations, would come within the statute, as a party to whom the child was confided. The remaining grounds covered by this fifth point have been sufficiently met by what has been said in reference to the indictment.

The judgment in this case must be reversed, the verdict set aside, and a new trial awarded.

MARTIN Ch. J. and CAMPBELL J. concurred.

MANNING J.:

I agree with my brethren, except in the construction given by them to the statute; and in that we differ but

98

SUPREME COURT OF MICHIGAN.

slightly. The word "expose," on which the construction of the section hinges, is here used, it seems to me, in the sense of "to cast out to chance; to place abroad, or in a situation unprotected" — one of the definitions given to the word by Webster; and that every abandonment, therefore, where there is no provision made for the protection of the child at the time of the abandonment, or previously, comes within the stat ute. Nothing short of this, I think, will satisfy the words of the statute, or fully meet the evil it was intended to suppress.

*Judgment reversed, and new trial awarded.*