PEOPLE v SCHAUB

Docket No. 231009. Submitted September 10, 2002, at Detroit. Decided November 15, 2002, at 9:10 A.M. Leave to appeal denied, 468 Mich 873.

Following a preliminary examination in the 42-2 District Court, the court, Paul A. Cassidy, J., dismissed a charge of child abandonment brought against Lawrence B. Schaub. The charge stemmed from an allegation that the defendant transferred possession of his ten-month-old child to an undercover police officer for financial gain. The court found that the prosecution had not met its burden of proof to show evidence of the elements of child abandonment, noting that at no time was the child placed in a situation where the child was without care. The prosecution appealed, and the Macomb Circuit Court, Mary A. Chrzanowski, J., reversed the order dismissing the charge and reinstated the charge, finding sufficient evidence to support a bindover for trial. The Court of Appeals denied the defendant's application for interlocutory leave to appeal. Unpublished order of the Court of Appeals, entered October 9, 2000 (Docket No. 229502). The Supreme Court, in lieu of granting the defendant leave to appeal, remanded the matter to the Court of Appeals for consideration as on leave granted. 463 Mich 910 (2000).

The Court of Appeals *held*:

1. The elements of child abandonment are exposing the child and the intent to wholly abandon the child.

2. Sufficient evidence was presented to show that the defendant intended to wholly abandon the child. The prosecution's proofs established this element.

3. The evidence presented did not establish the element of exposure. The child abandonment statute was implemented to prevent young children from being left unattended, with the intent to wholly abandon them, without some arrangements being made to ensure the children's safety and minimize the hazards of personal injury from abandonment.

4. The testimony shows that the defendant handed over the child to a person to care for her. Under the circumstances of this case, there is no basis on which to find that the child would be left without care, putting the child at risk of personal injury from abandon-

ment. The circuit court's order that reversed the district court's order dismissing the charge must be reversed and the matter must be remanded.

Reversed and remanded.

O'CONNELL, P.J., dissenting, stated that the evidence supports a finding that a question exists for determination by a jury regarding whether the delivery of the child to a total stranger "exposed" the child to injury. The statute does not necessarily require that the defendant have an intent to injure, but the element of exposure requires a showing that the child could possibly be subjected to the hazard of personal injury. The crime of child abandonment is complete when one exposes his child with the intent to abandon the child. It is a question of fact for a jury to determine whether selling your child to a total stranger meets the definitional requirements of exposure. Taking into consideration the modern time, place, and all the circumstances surrounding this incident, the defendant could not be certain that his baby would be cared for and, therefore, he violated the statute. The order of the circuit court should be affirmed.

1. PARENT AND CHILD — CHILD ABANDONMENT.

The elements of the crime of child abandonment are the exposure of a child under the age of six in any street, field, house, or other place with the intent to injure or to wholly abandon the child; to expose the child is the substantive act and the intent to abandon is the secondary ingredient; both elements must concur to complete the offense (MCL 750.135).

2. PARENT AND CHILD — CHILD ABANDONMENT.

The element of "exposure" contemplated by the child abandonment statute must be an exposure that may subject the child to hazard of personal injury; therefore, to leave a child with the intent to wholly abandon the child where the child would be certain to be cared for would not constitute such exposure; the question is whether the acts of the party abandoning the child, viewed in connection with the time, place, and all the accompanying and surrounding circumstances, subjected the child to the hazard of personal injury (MCL 750.135).

3. PARENT AND CHILD — CHILD ABANDONMENT.

An "exposure" for purposes of the crime of child abandonment is shown if, from the time, place, and manner of leaving the child, including its age, dress, the state of the weather, and all the circumstances surrounding and accompanying the transaction, the jury shall believe that there was reasonable ground to apprehend, or fear, that personal injury might thereby happen to the child;

such exposure, if accompanied with the intent wholly to abandon the child, completes the crime (MCL 750.135).

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, *Carl J. Marlinga*, Prosecuting Attorney, *Robert John Berlin*, Chief Appellate Lawyer, and *Joshua D. Abbott*, Assistant Prosecuting Attorney, for the people.

*David Pietroski* for the defendant.

Before: O'CONNELL, P.J., and GRIFFIN and HOEKSTRA, JJ.

HOEKSTRA, J. Defendant's appeal is before us by an order of the Supreme Court that, in lieu of granting leave to appeal, remanded the case to this Court for consideration as on leave granted. 463 Mich 910 (2000). The issue presented on appeal is, in essence, whether the prosecution introduced sufficient evidence at the preliminary examination to require defendant to stand trial on the charge of child abandonment, MCL 750.135. After taking testimony at the preliminary examination, the district court dismissed the charge. The prosecution appealed to the circuit court and that court reversed the order of the district court and reinstated the charge against defendant. On application for interlocutory leave to appeal, this Court denied leave. Unpublished order of the Court of Appeals, entered October 9, 2000 (Docket No. 229502). After consideration of the merits of the appeal, we agree with defendant and reverse the circuit court's order and remand the matter for further proceedings.

The charge against defendant of child abandonment stems from an allegation that defendant transferred

possession of his ten-month-old daughter to an under-cover police officer for financial gain. At the preliminary examination, the prosecution introduced testimony from defendant's daycare provider, who had contacted the police after defendant asked her if she knew anyone who wanted to buy his youngest child, and a police officer, who had posed as a well-to-do real estate broker that desired to obtain a baby for his childless "son" and "daughter-in-law." These witnesses testified that defendant willingly agreed to sell his daughter for $60,000 without verifying the background of the prospective buyer and his "son" and "daughter-in-law" and to relinquish all his parental rights to the child. After negotiating the terms and conditions of the "sale," defendant gave his daughter to a police officer posing as the buyer's son and received in exchange $10,000 in cash and the promise of an additional $50,000 within two days. Defendant also reduced to writing the financial terms of the agreement. The undercover police officer "buyer" testified that the child was never without care, having been transferred directly from defendant's presence to the buyer's "son." In addition, defendant informed them of the child's food requirements and discussed feeding and other procedures.

After hearing the witnesses' testimony and the arguments of the parties, the district court dismissed the child abandonment charge against defendant. The district court found that the prosecution had not met its burden of proof to show evidence of the elements of child abandonment. Specifically, the district court found that the term "wholly abandoned" in the child abandonment statute indicated placing the child in a situation where there is no one to care for it, and con-

cluded that at no time was the child placed in a situation where she was without care.

The prosecution appealed as of right to the circuit court, and that court reversed the district court's order dismissing the child abandonment charge. The circuit court found that the district court erred in its interpretation of the child abandonment statute. According to the circuit court, "intent to wholly abandon" concerns only the defendant's conduct and the defendant's actions "must be analyzed without reference to the likelihood or unlikelihood that his child would befall harm at the hands of the prospective parents." The circuit court concluded that the prosecution presented sufficient evidence on that element to bind over defendant for trial. In addition, the circuit court found that the element of exposure was adequately shown by defendant's failure to protect his daughter from danger by failing to make reasonable inquiries into the moral and financial fitness of the prospective parents.

On appeal, defendant argues that the circuit court erred in reversing the district court's dismissal of the child abandonment charge because the circuit court's interpretation of the elements of child abandonment was incorrect. Specifically, the parties dispute whether the evidence established the elements of (1) exposure and (2) intent to wholly abandon. Ordinarily, the decision of the district court on a motion to bind over is reviewed for an abuse of discretion. *People v Stone*, 463 Mich 558, 561; 621 NW2d 702 (2001). However, here the decision to deny binding over defendant involved a determination by the district court that defendant's alleged conduct did not fit within the scope of the child abandonment statute,

which raises a question of statutory interpretation that we review de novo. *Id.*

At the time that the alleged offense occurred, the child abandonment statute, MCL 750.135, provided:

> Any father or mother of a child under the age of 6 years, or any other person who shall expose such child in any street, field, house or other place, with intent to injure or wholly to abandon it, shall be guilty of felony, punishable by imprisonment in the state prison not more than 10 years.

MCL 750.135 has remained basically unchanged since it was first interpreted in 1858, in *Shannon v People,* 5 Mich 71 (1858).[1] We are aware of no other prece-

---

[1] The statute, as it read in 1858, stated:

"If the father or mother of any child under the age of six years, or any person to whom such child shall have been confided, shall expose such child in any street, field, house, or other place, with the intent wholly to abandon it, he or she shall be punished by imprisonment in the state prison not more than ten years." [*Shannon, supra* at 81.]

In relevant part, the statute currently reads:

A father or mother of a child under the age of 6 years, or another individual, who exposes the child in any street, field, house, or other place, with intent to injure or wholly to abandon the child, is guilty of a felony, punishable by imprisonment for not more than 10 years. [MCL 750.135(1).]

Further, in 2000, the statute, MCL 750.135, was amended to add the following section encouraging parents of unwanted newborns to deliver them to emergency service providers instead of abandoning them:

(2) Except for a situation involving actual or suspected child abuse or child neglect, it is an affirmative defense to a prosecution under subsection (1) that the child was not more than 72 hours old and was surrendered to an emergency service provider under chapter XII of the probate code of 1939, 1939 PA 288, MCL 712.1 to 712.20. A criminal investigation shall not be initiated solely on the basis of a newborn being surrendered to an emergency service provider under chapter XII of the probate code of 1939, 1939 PA 288, MCL 712.1 to 712.20.

dential Michigan case that has addressed the statute. In *Shannon,* our Supreme Court explained that once the person that is alleged to have abandoned the child is found to be either the child's parent or guardian, there are two additional elements of the crime of child abandonment. These elements are (1) exposing the child and (2) the intent to wholly abandon the child. *Id.* at 81, 89. According to the *Shannon* Court, "to 'expose' the child is the substantive act—the 'intent to abandon' is the secondary ingredient; both must concur to complete the offense." *Id.* at 89.

Here, with respect to whether defendant intended to wholly abandon the child, we agree with the circuit court that sufficient evidence was introduced to satisfy that element of the charged offense. The proofs showed that defendant sold his child to an undercover police officer for $10,000 cash and a note for $50,000, with the understanding that defendant did not retain any ability to visit the child or exercise his parental rights. The police officer testified that defendant was informed and agreed that the police officer's "family" was planning to raise the child as their own, without any intervention by defendant. From this evidence it is reasonable to conclude that defendant intended to "renounce all care or protection of" the child. See *id.* Although defendant asked for the address where the child would be located, the record reveals that the reason that defendant requested that information was to cover up the sale, if the child's mother returned from Texas and wanted to see her. It is clear from the evidence that defendant did not

---

Emergency service providers are defined in subsection 3 of the statute, MCL 750.135(3).

intend to participate in the child's life after the sale. Therefore, we conclude that the prosecution's proofs established the element that defendant intended to wholly abandon his daughter.

However, we conclude that the evidence presented did not establish the element of exposure.[2] With regard to exposure, the *Shannon* Court stated:

> The connection in which this section stands in our stat-
> ute, in the chapter entitled, "Of Offenses against the Lives
> and Persons of Individuals," as well as the severity of the
> punishment, we think very clearly indicate that the expo-
> sure contemplated by this section must be such as may sub-

---

[2] Although the dissent states that "the *Shannon* Court's definition of the term 'expose' is dicta," *post* at 127, we disagree. In *People v Higuera*, 244 Mich App 429, 437-438; 625 NW2d 444 (2001), this Court explained:

> Black's Law Dictionary (7th ed) defines obiter dictum as "[a] judicial comment made during the course of delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential (though it may be considered persuasive)." The Michigan Supreme Court has declared, however, that " '[w]hen a court of last resort intentionally takes up, discusses and decides a question *germane* to, though not necessarily decisive of, the controversy, such decision is not a *dictum* but is a judicial act of the court which it will thereafter recognize as a binding decision.' " *Detroit v Michigan Public Utilities Comm*, 288 Mich 267, 299-300; 286 NW 368 (1939), quoting *Chase v American Cartage Co, Inc*, 176 Wis 235, 238; 186 NW 598 (1922). A decision of the Supreme Court is authoritative with regard to any point decided if the Court's opinion demonstrates "application of the judicial mind to the precise question adjudged, regardless of whether it was necessary to decide the question to decide the case." *People v Bonoite*, 112 Mich App 167, 171; 315 NW2d 884 (1982).

We believe that the *Shannon* Court's analysis with respect to the term "expose" in the statute under which the defendant was charged is authoritative. After finding one exception decisive to the cause, the Court continued to address, discuss, and decide other issues that were germane to the controversy. As the *Shannon* Court itself stated, "there are other important questions presented by the exceptions . . . ." *Shannon, supra* at 82, 88. We believe that the *Shannon* Court's analysis is binding. *Higuera, supra* at 437.

ject the child to hazard of personal injury—such as may peril the life or health of the child, or produce severe suffering or serious bodily harm; and, hence, that to leave a child, with the intent wholly to abandon it, "in a house (or other place) where it would be certain to be cared for," would not constitute the exposure contemplated by the statute. We can not suppose the legislature intended to inflict so severe a punishment, to protect "persons not parents or guardians from being burdened with the care and custody of children," if they choose to assume that care and custody; or, in other words, from an unexpected demand upon their benevolence, from which they might rid themselves at any time by applying to the officers having charge of the poor. Such severity, for such a purpose, would be unprecedented in the history of legislation. On the other hand, it is perfectly clear that no actual injury need ensue from the exposure. *Id.* at 90.

The Court then looked further at the Legislature's intent in passing the child abandonment statute, concluding that "[t]he object of the statute obviously was to meet the exposure in injury in limine; to prevent the hazard of injury, and to punish as a crime the act creating the hazard." *Id.* at 91. The Court continued:

The question, therefore, upon this point, is simply this: Did the acts of the party leaving or abandoning the child, viewed in connection with the time, place, and all the accompanying and surrounding circumstances, subject the child to the hazard of such personal injury? If so, this is an exposure. . . .We do not intend, by this, to say that a bare possibility of injury would constitute the exposure; but the only safe and practical rule upon this point, we think, is this: If, from the time, place, and manner of leaving the child—its age, dress, the state of the weather, and all the circumstances surrounding and accompanying the transaction—the jury shall believe that there was reasonable ground to apprehend, or fear, that such injury might thereby happen to the child, then, if accompanied with the intent wholly to abandon, it is an exposure within the stat-

ute, and the crime is complete; but if, judging from the like premises, there was no reasonable ground to fear or apprehend that such injury might occur, then the exposure required by the statute did not exist. This may be rendered more definite by saying, that if the child be left at such a time, in such a place, and under such circumstances, as would render a parent, or other person (to whom it is confided) of ordinary prudence and humanity, reasonably apprehensive of such injury to the child, then the hazard may be said to exist, and it is an exposure within the statute.

*     *     *

*No parent, or other person entrusted with the custody and protection of helpless infancy, can be permitted to divest himself of the responsibility which this trust imposes, until that custody and protection have been committed to or assumed by other hands. And if, in the attempt to throw off the responsibility, he abandons the child, he must be required first to see that there is at least a reasonable certainty that some other person will assume it before the risk of injury shall occur from the abandonment;* he must be held to the highest degree of diligence. The safety of a human being depends upon his acts. The law extends its protection only to acts which are legal; he is in the performance of an illegal act—he has renounced the protection of the law, and must look to his own acts and his own diligence alone to protect him from criminal responsibility. [*Id.* at 91-92, 95-96 (emphasis supplied).]

From *Shannon*, it is apparent that the child abandonment statute was implemented to prevent young children from being left unattended, with the intent to wholly abandon them, without some arrangements being made to ensure the children's safety and minimize the hazards of personal injury from the abandonment. Although society may have changed since 1858, the statute has remained basically the same, and we are bound by our Supreme Court's interpreta-

tion of the statute. See *People v Beasley*, 239 Mich
App 548, 556; 609 NW2d 581 (2000). Here, unlike the
circuit court, we conclude that defendant's minimal
inquiry into the moral and financial background of
the police officer and his "family" cannot be con-
strued as "exposing" the child to the possibility of
personal injury as anticipated under this statute. The
testimony at the preliminary examination demon-
strated that defendant handed over his child to a per-
son to care for her. Under these circumstances, there
is no basis on which to find that the child would be
left without care, putting the child at risk of personal
injury from abandonment. Although defendant's
actions were repugnant, the evidence does not sup-
port the required statutory element of exposure as
interpreted by our Supreme Court in *Shannon*. There-
fore, the circuit court's reversal of the district court's
order dismissing the charge against defendant is
reversed.

In response to this case and the publicity it gener-
ated, the Legislature enacted with unusual quickness
a specific criminal statute that prohibits the sale or
purchase of people, MCL 750.136c.[3] While the ex post
facto guarantees of our state (Const 1963, art 1, § 10)

---

[3] MCL 750.136c provides:

(1) A person shall not transfer or attempt to transfer the legal or
physical custody of an individual to another person for money or
other valuable consideration, except as otherwise permitted by law.

(2) A person shall not acquire or attempt to acquire the legal or
physical custody of an individual for payment of money or other
valuable consideration to another person, except as otherwise per-
mitted by law.

(3) A person who violates this section is guilty of a felony pun-
ishable by imprisonment for not more than 20 years or a fine of not
more than $100,000.00, or both.

and federal (US Const, art I, § 10) constitutions bar defendant's prosecution under this new criminal provision, others who commit the proscribed conduct after the effective date of the act are subject to the new criminal penalties.

In addition, defendant may have committed a common-law felony by his attempt to sell his child. In particular, MCL 750.505 provides:

> Any person who shall commit any indictable offense at the common law, for the punishment of which no provision is expressly made by any statute of this state, shall be guilty of a felony, punishable by imprisonment in the state prison not more than 5 years or by a fine of not more than $10,000.00, or both in the discretion of the court.

See, generally, *People v Coutu (On Remand)*, 235 Mich App 695, 704-707; 599 NW2d 556 (1999); *People v Cunningham*, 201 Mich App 720, 722-723; 506 NW2d 624 (1993).

Because defendant has not been charged with committing a common-law felony and the prosecutor has not raised the issue, we express no opinion on the question whether attempted child selling was an indictable offense at common law. Rather, we note that our reversal is without prejudice to the filing of common-law felony charges in the event it is determined that defendant's actions were indictable at common law.

Reversed and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

GRIFFIN, J., concurred.

O'CONNELL, P.J. (*dissenting*). I respectfully dissent. The primary shortcoming of the majority is its conclusion that delivering a ten-month-old infant to a total stranger does not "expose" the infant to injury. In my opinion, the element of exposure is established if the prosecution can show that defendant put his infant daughter at risk. Common sense dictates that anyone who delivers an infant to a total stranger with the intent to totally abandon the infant puts her at risk of being subjected to numerous unknown dangers.[1] I concur with the majority that sufficient evidence was introduced to satisfy the second element of the offense—that defendant intended to abandon his child. Thus, because defendant both abandoned his infant daughter and put her at risk, the district court erred in failing to bind over defendant to stand trial on this matter.[2]

---

[1] The child abandonment statute, MCL 750.135, is designed to punish those individuals who abandon their child in a manner that puts the child at risk of some danger. *Shannon v People*, 5 Mich 71, 93-94 (1858). At common law, an individual could be punished only if injury to the child ensued. *Id.* at 90. In 1858, a major purpose of the statute was to punish those individuals who placed their children at risk. *Id.* at 90-91. In today's society, any responsible parent will tell you that, if you deliver your infant daughter to a stranger, you are putting her at risk of being subjected to numerous unknown dangers.

[2] In order to bind over defendant for trial, the district court was only required to determine whether, following the preliminary examination, the prosecutor presented competent evidence to believe that (1) a felony was committed and (2) probable cause to believe that the defendant committed the felony. *People v Northey*, 231 Mich App 568, 574; 591 NW2d 227 (1998).

Because the issue before us depends on a question of fact, only a jury may decide it, as well as the ultimate guilt of defendant. *Shannon, supra* at 97 (child abandonment is a fact question); *People v Nash*, 110 Mich App 428, 439; 313 NW2d 307 (1981) (abandonment element in property law case was fact question); *People v Artman*, 218 Mich App 236, 239; 553 NW2d 673 (1996) (questions of fact in criminal cases are for the jury).

## I. THE COMMON LAW

MCL 750.135 makes it a crime to expose a child with intent to injure or wholly abandon the child. At common law, the exposure of a child with the intent to abandon the child was not a crime unless injury to the child actually occurred. *Shannon v People*, 5 Mich 71, 91 (1858). The crime was measured by the result of the abandonment. In other words, the common law punished the perpetrator for the injury, not for "the *exposure* to, or *hazard* of, the injury." *Id.* (emphasis in original). It was often difficult to determine if the injury was the result of the exposure or of some other cause. *Id.* Because the common-law remedy did not prevent injury, the object of the child abandonment statute was to punish as a crime the act that created the hazard *before* injury could occur.[3] *Id.*

---

[3] Thus, the majority erroneously implies reliance on the fact that in this case defendant's baby was not actually exposed to injury, because an undercover police officer "bought" her and then turned her over to the Family Independence Agency. The problem with this premise is that the majority is looking at the circumstances in this case objectively, *with* the knowledge that a police officer was posing as the child purchaser. See *Shannon, supra* at 94 (a defendant's expectations regarding fitness of person receiving the child are irrelevant). To the contrary, it is undisputed that defendant did not definitively know who the buyers were. Thus, regardless of what actually happened to the child, defendant's intent to sell his daughter to a stranger was culpable. Cf. *People v Thousand*, 465 Mich 149, 157-158; 631 NW2d 694 (2001) ("factual impossibility" is no defense to an attempt crime).

Indeed, it is defendant's intent that is punishable in the offense of child abandonment. See MCL 750.135; *Shannon, supra* at 91. Child abandonment is likely a general intent crime because the statute does not identify a particular state of mind or intended end result for culpability. See *People v Disimone*, 251 Mich App 605, 610-611; 650 NW2d 436 (2002) (definition of specific and general intent crimes). Because child abandonment is a general intent crime, defendant's mere intent to abandon his child was culpable. Again, defendant did not have to specifically intend that the baby be injured to be bound over for trial on the charge of child abandonment. See *id.*; *Shannon, supra* at 90-91.

at 91. In this way, the *Shannon* Court carefully distinguished the common law from the statute.

### A. THE FACTS OF *SHANNON v PEOPLE*

*Shannon* was decided in 1858, and the Court was concerned with what we now call aiding and abetting. At that time, the principle of law now known as aiding and abetting was in its infancy and subject to much legal discourse. In *Shannon, supra* at 73-74, the defendant instructed two men to go to his girlfriend's home, take his eight-month-old infant from her, and deliver the child to the doorstep of an unsuspecting third party.[4] One of the issues that arose was whether the child would be properly cared for. The defendant claimed he could not be convicted because he did not personally abandon the child and because his cohorts in crime did not follow his instructions to make sure the child was properly cared for when she was abandoned. *Id.* The defendant also claimed that if the child was properly cared for he could not be convicted of exposing the child to any danger. *Id.* at 74.

### B. "ABANDON" AT COMMON LAW

It is important to note that the two elements of abandonment and exposure overlap significantly. See *id.* at 90 ("to 'expose' the child is the substantive act—the 'intent to abandon' is the secondary ingredient; both must concur to complete the offense"). According to *Shannon, supra* at 89, "the term 'abandon' is here used in its ordinary sense—to forsake, to

---

[4] Thus, *Shannon* is distinguishable on its facts because they are inapposite to the case at bar.

leave without the intention to return to, to renounce all care or protection of." In the old days, children were generally abandoned where people frequented most, so they might be found and taken care of by compassionate individuals who were in a position to care for them. *Id.* at 90. Egyptians and Romans left children on the banks of rivers, Greeks chose the highways, and, in England, it appears that leaving the child on the doorstep of another and ringing the bell was the chosen method of abandonment. See *id.* at 90. If the child was taken in and cared for and no injury occurred, then no crime was committed under the common law.

### C. "EXPOSE" AT COMMON LAW

In light of the common law, the *Shannon* Court struggled in 1858 to find a suitable definition for the term "expose." The Court stated:

> The term "expose," in such a connection, does not appear to have become a legal term, the meaning of which is settled by judicial decision, either in this country or in England. . . . [T]herefore, . . . we are compelled to seek for its meaning in the general popular sense of the term, the context, the subject matter, and what we may deem to have been the occasion and design of the statute. [*Id.* at 89.]

In my view, *Shannon* supports the circuit court's decision to reverse the order of the district court and reinstate the charge. *Shannon* held:

> [T]o leave a child, with the intent wholly to abandon it, "in a house (or other place) *where it would be certain to be cared for*," would not constitute the exposure contemplated by the statute. . . .

* * *

The question, therefore, upon this point, is simply this: Did the acts of the party leaving or abandoning the child, viewed in connection with the time, place, and all the accompanying and surrounding circumstances, subject the child to the hazard of such personal injury?[5] [*Id.* at 91-92 (quotations omitted; emphasis added).]

The *Shannon* Court then concluded that child abandonment "is a question of fact, for the good sense of a jury under the rule of law above laid down." *Id.* at 97.

## II. MODERN LAW[6]

The majority diligently relies on *Shannon* to infer a definition of "expose," but more recent authority could aid in their definitional conundrum. While I find the 1858 *Shannon* decision a helpful starting point, I do not find it dispositive of this case.[7]

---

[5] Another way to explain this standard is whether the defendant "subjected [the child] to the *risk* of injury[.]" *Shannon, supra* at 94 (emphasis in original). In my view, if the defendant did not put a child at risk, then the case does not fall within the scope of the child abandonment law. However, if a child was put at risk, then the law applies. The majority erred in failing to determine that if a reasonable person could conclude that the child was put at risk, then child abandonment is a jury question. See also *id.* at 97. Only if, on the basis of all the facts and circumstances, a reasonable person could *not* conclude that this child was put at risk, does the issue become a question of law for a court to decide de novo. See *People v Hudson*, 241 Mich App 268, 276; 615 NW2d 784 (2000) (appellate standard of review).

[6] In *Shannon, supra* at 82-83, our Supreme Court stated that its interpretation of the term "confided" in the statute, i.e., "the first exception," "is well taken, and is decisive of the cause." Because this issue was decisive of the case, the balance of the opinion was not necessary to the Court's decision, and was, therefore, obiter dicta. Under the rule of stare decisis, dicta is not controlling precedent. See *People v Squires*, 240 Mich App 454, 458; 613 NW2d 361 (2000). Thus, this Court is not compelled to follow the definition of "expose" expressed in *Shannon.*

[7] However, even if I were to accept *Shannon*'s definition of "expose," I believe that *Shannon* supports the conclusion that whether exposure actually occurred in the present case is a question of fact for a jury. See *Shannon, supra* at 97.

While the *Shannon* Court's definition of the term "expose" is dicta, it also is distinguishable from the present case by the passage of time, a change in circumstances, and subsequent judicial decisions. See, generally, *In re Edgar Estate*, 425 Mich 364, 380; 389 NW2d 696 (1986) (in statutory interpretation, a court may properly take into consideration societal changes); *Corl v Huron Castings, Inc*, 450 Mich 620, 632; 544 NW2d 278 (1996) (stare decisis will not apply to prevent consideration of a better law in view of changed societal circumstances, where an error was made, or where injustice will result from adhering to the old rule).

In 1858, times were a little different. The Family Independence Agency did not exist and adoption procedures were not what they are today. Families were the cornerstone of society, and large, two-parent families were not unusual. People in a community generally knew each other. Cities were more rural than urban, and crime was not what it is today. Thus, this Court should examine the societal evolution of the terms used in the child abandonment statute, as well as the modern "time, place . . . and all the circumstances surrounding" this issue to make its decision.[8] *Shannon, supra* at 92.

---

[8] I note, as the circuit court in this case did, that the district court declined to bind over defendant because it found that the element of intent to wholly abandon was not established. See *People v Northey*, 231 Mich App 568, 574; 591 NW2d 227 (1998). The circuit court's decision, in contrast, found that the prosecution established that defendant did intend to wholly abandon his infant daughter. The circuit court also stated that the district court had confused the abandonment and exposure elements. Finally, the circuit court concluded that the prosecution presented enough evidence to proceed to a jury regarding whether the infant was exposed in violation of *Shannon*, because a reasonable person would have been apprehensive about defendant's actions in this case. See *People v Crippen*, 242 Mich App 278, 281-282; 617 NW2d 760 (2000) (circuit court standard of review). I reiterate that, after a sufficient showing by the prosecution,

### A. MODERN DEFINITION OF "ABANDON"

Because the elements of child abandonment have not been clearly defined in their specific context, dictionary definitions may be relied on to determine the meaning of the child abandonment statute.[9] *Id.* at 89; *People v Stone*, 463 Mich 558, 563; 621 NW2d 702 (2001). "Abandon" is defined as "to leave completely and finally; forsake utterly; desert: to abandon a child . . . ." *Random House Webster's College Dictionary* (2001) (emphasis omitted); see also *Shannon, supra* at 88-89. Abandonment is a question of fact. See *People v Nash*, 110 Mich App 428, 439; 313 NW2d 307 (1981) (abandonment element in property law case was fact question); see also *Shannon, supra* at 97 (child abandonment is a fact question).

### B. MODERN LEGAL DEFINITION OF "EXPOSE"[10]

Today, unlike in *Shannon's* day, the term "expose" does have a legal meaning. In the past 150 years,

---

see *Northey, supra,* whether a child abandonment has occurred is a question of fact for a jury. See *Shannon, supra* at 97; see also, generally, *Nash, supra; Artman, supra.*

[9] I note that statutory interpretation is the responsibility of the judges of the court system. Contrary to the majority's implication, statutory interpretation is not the responsibility of the Legislature. See, generally, Const 1963, art 3, § 2, art 4, § 1, art 6, § 1; *People v Warren*, 462 Mich 415, 427; 615 NW2d 691 (2000). In the present case, the circuit court properly determined that defendant's actions fit within the four corners of the child abandonment statute.

[10] *Walton v Southfield*, 748 F Supp 1214 (ED Mich, 1990), interpreted the *Shannon* Court's definition of "exposure." However, *Walton* does not apply to the present case for several reasons. In *Walton, supra* at 1216-1217, a grandmother sued the police under MCL 750.135 for child abandonment of her daughter and granddaughter when the police arrested the grandmother and left the children alone in the car for some time. *Walton* is a nonbinding federal district court opinion that was reversed in part at 995 F2d 1331 (CA 6, 1993). See *Sharp v Lansing*, 464 Mich 792, 802-803; 629 NW2d 873 (2001). Moreover, there was no sale of children in *Walton,*

numerous courts have defined the term. "Exposure" is defined as "a laying open to the action or influence of something . . . ." *Random House Webster's College Dictionary* (2001); see also *People v Vronko*, 228 Mich App 649, 653-654; 579 NW2d 138 (1998) (definition of "exposure" in indecent exposure case); *Shannon, supra* at 89 ("expose" means " 'to place in a situation to be affected or acted on . . . to cast out . . . in a situation unprotected.' "), quoting *Webster's Dictionary*. The statute does not necessarily require that the defendant have an intent to injure, but the element of exposure must possibly subject the child to the hazard of personal injury. See *Shannon, supra* at 90. For example, to commit the crime of indecent exposure, one only has to expose a part of one's anatomy to another and the crime is complete. *Vronko, supra* at 656-657. Using this definition of expose, in my opinion, the crime of child abandonment is complete when one exposes his child with the intent to abandon.[11]

### III. APPLICATION OF MODERN LAW

Applying these principles to the facts of this case, it is clearly a question of fact for a jury to determine whether selling your child to a total stranger meets the definitional requirements of exposure. See *Shannon, supra* at 97; *People v Artman*, 218 Mich App 236, 239; 553 NW2d 673 (1996). This is especially true considering the fact that in the present case, defendant had no idea to whom he was selling his child.

---

and the children were not left with a stranger, as in the present case. *Walton, supra* at 1216-1217.

[11] I note that MCL 750.135(2) now provides a safe harbor for persons delivering to a hospital an infant seventy-two hours old or less.

In my view, any parent or juror would be "reasonably apprehensive" about turning over a child to a total stranger, who could actually be a pedophile or a child pornographer.[12] *Shannon, supra* at 93. In the present case, defendant could not be certain that the buyer of his infant daughter would care for her. It is undisputed that defendant did not thoroughly investigate the buyer or his fictitious son and daughter-in-law who were to be the ultimate recipients and caregivers of the child. In fact, the "buyers" were not who defendant allegedly thought they were. The buyer was an undercover police officer, and the claimed father-to-be was an associate; the "mother" did not appear at all for defendant to meet. The majority erroneously assumes that defendant could reasonably believe the word of total strangers that the baby would be raised properly. In my opinion, under the statute, defendant criminally exposed his daughter by intending to sell her to total strangers, without establishing that the baby would be properly cared for. See *id.* at 91.

Today, adoptive parents, foster parents, and even daycare providers have strict licensing regulations

---

[12] Indeed, I note that on occasion, children are sold for drugs, into prostitution, or like situations. See, e.g., *In re Thacker*, 881 SW2d 307, 310 (Tex, 1994) ("The evils inherent in baby-bartering are loathsome for a myriad of reasons. The child is sold without regard for whether the purchasers will be suitable parents."); *In re Adoption of E W C*, 89 Misc 2d 64, 75; 389 NYS2d 743 (Surrog Ct, 1976) (detailing interstate baby-selling operation with no regard to assuring proper "adoptive" parents); Note, *Responses to the international child sex tourism trade*, 19 BC Int'l & Comp L R 397, 401, 415-416 (1996) (noting that Americans' participation in international child sex trade is punishable in the United States under new law).

In fact, in the present case, the record reveals that defendant was only concerned about the price he would get for his infant daughter, not the fitness of the prospective parents, and that defendant compared the sale of his child to selling a dog.

placed on them by this state. Moreover, prospective parents and caregivers are thoroughly investigated for proof of their character. See, e.g., MCL 722.954b(3), 722.958(3) (Foster Care and Adoption Services Act). These practices reflect the reasonable belief that, especially in today's society, this state must be sure that persons entrusted with the care of children are above reproach. Regulations include background checks, surprise home visits, and so forth. See, e.g., MCL 722.954b(3) (in-home visits of adoptive homes). Even custody determinations between two known parents are made with extensive inquiry into the parents' fitness. See MCL 722.23 (best interest of the child factors considered in custody cases); see also MCL 712A.19b(3) (standards for termination of parental rights). In contrast, the present defendant did not even attempt an investigation comparable to one that the law requires of daycare providers, although he was selling his baby daughter to a complete stranger and agreed never to see her again (for a higher price). Thus, taking into account the modern "time, place . . . and all the circumstances surrounding" this incident, defendant could not "be certain" that his baby would "be cared for," and, therefore, he violated the statue. *Shannon, supra* at 90, 91, 92.

### IV. CONCLUSION

The majority's interpretation of the term "expose," using nineteenth century societal norms, is diligent.[13]

---

[13] In my opinion, if defendant had sold his infant daughter to a pedophile, the majority opinion would conclude that defendant's actions are within the scope of this statute. Not even the majority could disagree that selling your child to a pedophile puts the child at risk. The flaw in the majority's logic is the conclusion that the purchasers of this baby were respectable individuals. It is beyond dispute that defendant had no idea

Perhaps at that time it was not dangerous to give your child to a stranger. Today, it is at a minimum a fact question for a jury whether selling your baby to a stranger exposes her to injury. *Nash, supra; Shannon, supra* at 97.

For these reasons, I would affirm the circuit courts order reversing as an abuse of discretion the district court's order dismissing the charge against defendant.

---

who was purchasing his daughter. Defendant did not know whether the purchasers were pedophiles, child pornographers, solicitors of child prostitution, or drug addicts. In my opinion, to view the facts of this case in hindsight is simply untenable.