S ABRAHAM & SONS, INC v DEPARTMENT OF TREASURY
GITZEN COMPANY v DEPARTMENT OF TREASURY
MOTOR CITY TOBACCO AND CANDY COMPANY v
DEPARTMENT OF TREASURY
EBY-BROWN COMPANY v DEPARTMENT OF TREASURY
RICHMOND MASTER DISTRIBUTORS v DEPARTMENT OF TREASURY

Docket Nos. 241154, 241155, 241156, 241157, 241158. Submitted October 21, 2003, at Lansing. Decided December 11, 2003, at 9:00 A.M.

S. Abraham & Sons, Inc., and other wholesalers of tobacco products brought actions in the Court of Claims against the Department of Treasury, seeking refunds by the defendant of tobacco-products taxes prepaid by the plaintiffs in 1998 and 1999 on sales of tobacco products to customers who failed to pay for their purchases after reasonable collection efforts by the plaintiffs. The plaintiffs also sought interest, costs, and attorney fees. In the case involving Abraham, the court, Michael G. Harrison, J., on cross-motions for summary disposition, ruled that a bad-debt deduction was available under the Tobacco Products Tax Act (TPTA), MCL 205.421 et seq., granted Abraham's motion, and remanded the matter to the defendant for a determination of the refund, if any, to be awarded to Abraham under § 7(6) of the TPTA, MCL 205.427(6). The Court of Appeals dismissed an appeal of right by the defendant for lack of jurisdiction because the defendant had not yet made a determination regarding the amount of the refund. The Court of Claims made similar rulings in the other cases. On remand, the Commissioner of Revenue issued decisions and orders denying the plaintiffs' refund requests and reserving the right to appeal the court's orders. The plaintiffs each filed a "Verified Complaint and Appeal" in the Court of Claims by which they appealed from the denials of the refund requests and sought to have the defendant held in contempt of court for disregarding the court's orders. The defendant moved for summary disposition in each case. The court, Thomas L. Brown, J., pursuant to MCR 2.116(I)(2), instead granted summary disposition for each plaintiff, determined the refund amount due each plaintiff after conducting evidentiary hearings, and granted the plaintiffs' motions for costs and attorney fees as sanctions for the defendant's contempt of court. The defendant appealed in each case, and the appeals were consolidated.

The Court of Appeals *held*:

1. At the times relevant to these cases, a bad-debt deduction was available under the TPTA. The TPTA, both before and after it was amended by 1997 PA 187, effective December 30, 1997, to provide in MCL 205.427a that "[i]t is the intent of this act to impose the tax levied under this act upon the consumer of the tobacco products by requiring the consumer to pay the tax," did not expressly provide for a bad-debt deduction. The TPTA also contained provisions, e.g., MCL 205.427(3), (7), that conflicted with the legislative intent stated in MCL 205.427a that tobacco consumers were to pay the tax. This ambiguity must be resolved in a manner that comports with the legislative intent that consumers bore responsibility for the tax. Thus, sanctions for a wholesaler's failure to pay the tax could not be imposed when the wholesaler's failure to pay occurs because of its good faith inability to collect the tax that was the responsibility of the consumer. Similarly, when a wholesaler prepaid the tax on behalf of consumers and was unable to recoup the tax, the wholesaler could seek reimbursement from the defendant.

2. The Court of Claims did not err by not limiting reimbursement to taxes paid after the effective date of MCL 205.427a. The addition of MCL 205.427a to the TPTA did not represent a change in the law and merely clarified legislative intent that although the tax was to be collected by the wholesaler for transmittal to the defendant, the tax was ultimately imposed on the consumer.

3. The Court of Claims erred by awarding plaintiffs attorney fees and costs as contempt sanctions. Because the court did not make specific findings that the defendant was in contempt of an order of the court, the awards lacked any basis.

4. The factual findings of the Court of Claims with respect to the refund amounts due Eby-Brown Company and Motor City Tobacco and Candy Company were supported by material, competent, and substantial evidence.

Affirmed in part, reversed in part, and remanded for further proceedings.

TAXATION — TOBACCO PRODUCTS TAX — PREPAID TAXES — BAD-DEBT DEDUCTION.

The tax levied pursuant to the Tobacco Products Tax Act, although collected by wholesalers for transmittal to the Michigan Department of Treasury, is the liability of consumers of tobacco products; when a wholesaler prepays the tax on behalf of consumers but is unable to collect the tax from consumers upon reasonable efforts to do so, the wholesaler may seek reimbursement from the department (MCL 205.421 *et seq.*).

*Howard & Howard Attorneys, P.C.* (by *Michelle L. Halloran, Michael J. Brown,* and *Gina M. Torielli*), for S. Abraham & Sons, Inc.

*Michael A. Cox,* Attorney General, *Thomas L. Casey,* Solicitor General, and *Roland Hwang* and *Glenn R. White,* Assistant Attorneys General, for the defendant.

Before: SMOLENSKI, P.J., and MURPHY and WILDER, JJ.

WILDER, J. In these consolidated cases, defendant Department of Treasury appeals by right the trial court's decisions to grant tax refunds to plaintiffs S. Abraham & Sons, Inc. (Abraham), Gitzen Company, Motor City Tobacco and Candy Company (Motor City), Eby-Brown Company (Eby-Brown), and Richmond Master Distributors, as well as the trial court's decision to award plaintiffs attorney fees and costs as a contempt sanction. We affirm in part and reverse in part.

I

In 1999, plaintiffs, wholesalers of tobacco products as defined by the Tobacco Products Tax Act (TPTA), MCL 205.421 *et seq.,* jointly filed a complaint against defendant in the Court of Claims,[1] alleging that, during various periods ranging from 1994 to 1998, they prepaid tobacco-products taxes to defendant that included taxes on sales to customers who failed to pay plaintiffs for their purchases. After allegedly reasonable collection efforts failed, plaintiffs timely

---

[1] By filing that action, plaintiffs were appealing a treasury department decision, pursuant to MCL 205.22. Their complaint, however, did not indicate its status as an appeal.

requested refunds from defendant in 1998 and 1999 for the taxes they paid on these uncollectible accounts. Defendant denied plaintiffs' refund requests. In count I of their complaint, plaintiffs alleged that defendant unlawfully and erroneously interpreted the TPTA and that plaintiffs were entitled to refunds for overpaid taxes, together with interest, costs, and attorney fees.[2] Defendant successfully moved for misjoinder, and plaintiffs then filed separate but virtually identical complaints.

Thereafter, the parties filed cross-motions for summary disposition. In the Abraham action, the Court of Claims, Michael G. Harrison, J., concluded that a bad-debt deduction is available to Abraham under the TPTA, denied defendant's motion for summary disposition, and granted Abraham's motion for summary disposition. Additionally, the trial court remanded the case to defendant "for a determination of the refund, if any, to be awarded to the [p]laintiff under MCL 205.427(6) . . . ." The trial court did not retain jurisdiction.

Defendant claimed an appeal of right from the trial court's decision in the Abraham suit. This Court dismissed defendant's appeal on May 3, 2000, asserting a lack of jurisdiction "because no determination has yet been made regarding the amount of the refund that

---

[2] Plaintiffs included two other counts in their complaint that are not relevant on appeal. In count II, plaintiffs claimed that defendant acted arbitrarily and capriciously in determining the meaning of "causes [for refunds] the department considers expedient," MCL 205.427(6), violating plaintiffs' due process rights. Similarly, in count III, plaintiffs claimed defendant's failure to recognize a bad-debt deduction under the TPTA amounted to an arbitrary classification in light of defendant's recognition of a bad-debt deduction for the sales and use taxes, which violated plaintiffs' right to equal protection.

the plaintiff is to receive." Defendant did not request leave to appeal the trial court's decision to this Court.

On August 16, 2000, the trial court heard plaintiffs' and defendant's motions for summary disposition in the four remaining cases. Defendant repeated the arguments raised in its motion in the Abraham suit and also argued that because the statute on which the trial court primarily relied in granting summary disposition to Abraham, MCL 205.427a, did not take effect until December 1997, plaintiffs' claims before the effective date of MCL 205.427a should be denied. As in the Abraham case, the trial court concluded that a bad-debt deduction is available under the TPTA and remanded to defendant for a determination of the refund, if any, to be awarded to plaintiffs. The trial court did not address defendant's arguments about the relevance of the effective date of MCL 205.427a.

Pursuant to the remand orders, defendant's Commissioner of Revenue issued a Decision and Order of Determination in each case, denying plaintiffs' refund requests and reserving defendant's right to appeal the trial court's orders. In part, the decisions stated:

> It appearing that the recommendation [from the Administrator, Customer Contact Division,] is supported by authority and reasoned opinion, and the same is accordingly accepted;
>
> *    *    *
>
> Pursuant to § 27(6), MCL 405.427(6) . . . , an abatement or refund of the tax may be made by the Department for causes the Department considers expedient. The Department in review of this matter does not consider uncollectible accounts as such a cause for abatement or refund.
>
> The March 1, 2000 Opinion and March 21, 2000 Order [of the trial court] notwithstanding, the Department is of the

position that the [TPTA] does not provide for a bad debt deduction or refund of tobacco taxes paid by a licensee in the event that a tobacco retailer's account becomes uncollectible. The amount of refund tabulated above [specific to each case] is not recommended to be paid, subject to the rights of the Department to appeal of any Final Order or Order directing payment.

On the same day the decisions were issued, defendant's Customer Contact Division Administrator wrote letters to plaintiffs' counsel denying each of the refund requests. Thereafter, plaintiffs each filed a "Verified Complaint and Appeal" in the Court of Claims. In count I of the virtually identical complaints, plaintiffs claimed an appeal from defendant's decision to deny their refund requests, as permitted by MCL 205.22. Plaintiffs alleged that defendant's denial of the refund requests in May 2001 directly contravened the prior orders of the Court of Claims. In count II, plaintiffs asserted that defendant's Decision and Order of Determination in each case "blatantly thwarts" the prior orders of the Court of Claims and requested that defendant be held in contempt for disregarding the prior orders.

Subsequently, defendant moved for summary disposition pursuant to MCR 2.116(C)(8) and (C)(10) and to strike or dismiss count II of plaintiffs' complaints pursuant to MCR 2.115(B). Defendant once again asserted that plaintiffs bear the responsibility for the tobacco products tax and that the TPTA does not contain an express or implied bad-debt deduction. In requesting that count II of plaintiffs' complaints be stricken, defendant also asserted that because the trial court had not ordered defendant to actually pay plaintiffs a tobacco tax refund, defendant had com-

plied with Judge Harrison's orders and plaintiffs' claim of contempt was vexatious and unwarranted. Plaintiffs opposed both motions and requested summary disposition in its favor pursuant to MCR 2.116(I)(2).

The Court of Claims, Thomas L. Brown, J., denied defendant's motion for summary disposition and granted plaintiffs' request for summary disposition pursuant to MCR 2.116(I)(2).[3] Plaintiffs requested that the trial court hold an evidentiary hearing to determine the refund amount due each plaintiff in light of defendant's decision on remand. Defendant and the trial court agreed on this procedure. The trial court held defendant's motion to strike in abeyance.[4]

In February 2002, the trial court received testimony concerning the amount of plaintiffs' refund requests. The trial court rejected defendant's arguments that Eby-Brown lacked sufficient documentation to support its refund request and also concluded that Motor City made reasonable efforts to collect the debt owed by R&J Distributors (R&J).

On April 2, 2002, plaintiffs filed a "Motion to Award Costs and Fees to Plaintiff Based on Defendant's Contempt of Court,"[5] which the trial court heard on April 16, 2002. Defendant opposed the motion, contending

---

[3] The order resolving defendant's motion indicates that the Court of Claims granted plaintiffs' motion for summary disposition. Plaintiffs, however, did not file a motion for summary disposition but requested summary disposition pursuant to MCR 2.116(I)(2) in response to defendant's motion.

[4] The record does not reflect that the Court of Claims ever decided the merits of defendant's motion.

[5] On the following day, defendant filed a motion for summary disposition on the contempt count of plaintiffs' complaint. Because of the timing of the hearing on plaintiff's motion for attorney fees, the trial court did not hear defendant's motion for summary disposition.

that plaintiffs had failed to produce evidence of indirect contempt and that the record did not support a finding of direct contempt. The trial court granted plaintiffs' motion, stating in part:

> Well, the [c]ourt agrees with the [p]laintiff[s] that the [d]efendant's machinations in this matter to cause the [p]laintiffs economic detriment by way of attorneys fees, costs on filing unnecessary motions, so on, so forth, and the failure to follow Judge Harrison's orders. I could probably go through here and go to great, make great effort to perhaps reduce Mr. Brown's request, but since the [d]efendant's going to appeal the whole thing, the whole kit and caboodle, I am going to grant his request and we will let the parties justify them on appeal.

The trial court awarded plaintiffs costs and attorney fees from the time of filing their initial complaints. This appeal followed.

II

This Court reviews questions of statutory interpretation de novo. *People v Schaub*, 254 Mich App 110, 114-115; 656 NW2d 824 (2002). Our main goal when interpreting a statute is to give effect to the Legislature's intent, as expressed in the language of the statute itself. *STC, Inc v Dep't of Treasury*, 257 Mich App 528, 533; 669 NW2d 594 (2003). If the statutory language is unambiguous, judicial construction is neither permitted nor required. *Id.* However, if reasonable minds could differ with respect to the language's meaning, the language is ambiguous, and judicial construction is necessary. *In re MCI*, 460 Mich 396, 411; 596 NW2d 164 (1999). "Where ambiguity exists . . . this Court seeks to effectuate the Legislature's intent through a reasonable construction, con-

sidering the purpose of the statute and the object sought to be accomplished." *Macomb Co Prosecutor v Murphy*, 464 Mich 149, 158; 627 NW2d 247 (2001), citing *Frankenmuth Mut Ins Co v Marlette Homes, Inc*, 456 Mich 511, 515; 573 NW2d 611 (1998).

We review a trial court's order of contempt for abuse of discretion. *In re Contempt of Steingold*, 244 Mich App 153, 157; 624 NW2d 504 (2000), citing *Schoensee v Bennett*, 228 Mich App 305, 316; 577 NW2d 915 (1998). "[T]o the extent that [this Court's] review in this case requires [it] to examine questions of law, such as the nature of the contempt orders and whether the contempt statute permitted the sanctions imposed in this case, review is de novo." *In re Contempt of Auto Club Ins Ass'n*, 243 Mich App 697, 714; 624 NW2d 443 (2000).

This Court applies the substantial evidence test to the Court of Claims decision regarding an appeal from a treasury department decision. *Curis Big Boy, Inc v Dep't of Treasury*, 206 Mich App 139, 143; 520 NW2d 369 (1994).[6]

---

[6] The parties assert that the applicable standard of review is that described in *Boyd v Civil Service Comm*, 220 Mich App 226; 559 NW2d 342 (1996), and recently reiterated in *Mantei v Michigan Pub School Employees Retirement Sys*, 256 Mich App 64, 71-72; 663 NW2d 486 (2003):

On direct review of an agency decision, a trial court must determine whether the administrative action was authorized by law and whether the agency decision was supported by competent, material, and substantial evidence on the whole record. Const 1963, art 6, § 28; MCL 24.306(1); *Boyd* [, *supra* at 232]. Substantial evidence is any evidence that reasonable minds would accept as adequate to support the decision; it is more than a mere scintilla of evidence but may be less than a preponderance of the evidence. . . . This Court's review of the circuit court's decision is, in turn, limited to a determination "whether the lower court applied correct legal principles and whether it misapprehended or grossly misapplied the substantial evidence test to the agency's factual findings." *Boyd,*

III

### A. BAD-DEBT DEDUCTION

Defendant first claims that the trial court erred by finding that a bad-debt deduction was available under the TPTA before it was amended and by granting plaintiffs refunds for taxes prepaid on uncollectible accounts. We disagree.

In 1993, the Legislature enacted the TPTA and repealed its predecessor, the Cigarette Tax Act, MCL 205.501 *et seq.* The TPTA contains provisions regulating distributors of tobacco products and establishing a tax on the sale of tobacco products. In 1997, the Leg-

---

*supra* at 234. This standard of review is indistinguishable from the "clearly erroneous" standard of review.

We disagree. Pursuant to MCL 205.22, a taxpayer has the option to appeal an adverse departmental decision to the Court of Claims or the Tax Tribunal. Because proceedings before the Tax Tribunal are original, a departmental decision that has been appealed to the Tax Tribunal is reviewed by the tribunal de novo. MCL 205.735. MCL 205.22 also provides that either the taxpayer or the department may appeal by right to this Court a decision of the Tax Tribunal or the Court of Claims, and that the appeal shall be taken on the record made at the tribunal or the Court of Claims. In *Curis Big Boy, supra* at 143, this Court discussed the standard of review on an appeal from the Tax Tribunal:

> Our review of Tax Tribunal decisions, absent fraud, is limited to whether the tribunal made an error of law or adopted a wrong principle. We accept the factual findings of the tribunal as final, provided they are supported by competent, material, and substantial evidence. *Dow Chemical Co v Dep't of Treasury*, 185 Mich App 458, 462-463; 462 NW2d 765 (1990).

The Court of Claims and the Tax Tribunal are in identical postures when conducting a review of a departmental decision. We conclude there is no principled, statutory basis to conduct our review of a decision of the Court of Claims any differently than we would when reviewing a decision of the Tax Tribunal. Accordingly, we will also review the decision of the Court of Claims to determine whether there was competent, material, and substantial evidence on the whole record to support the decision. See *Curis Big Boy, supra.*

islature made substantial additions to the TPTA, including establishing requirements for affixing treasury department stamps to packages of cigarettes, MCL 405.426a, and expressly stating the Legislature's intent to impose the tobacco products tax on the consumer: "[i]t is the intent of this act to impose the tax levied under this act upon the consumer of the tobacco products by requiring the consumer to pay the tax at the specified rate," MCL 205.427a.

At all times relevant to this appeal,[7] § 7 of the TPTA, MCL 205.427, provided:

> (1) Beginning May 1, 1994, a tax is levied on the sale of tobacco products sold in this state as follows:
>
> (a) For cigars, noncigarette smoking tobacco, and smokeless tobacco, 16% of the wholesale price.
>
> (b) For cigarettes, 37.5 mills per cigarette.
>
> (2) On or before the twentieth day of each calendar month, every licensee under section 3 [MCL 205.423] other than a retailer, secondary wholesaler, unclassified acquirer licensed as a manufacturer, or vending machine operator shall file a return with the department stating the wholesale price of each tobacco product other than cigarettes purchased, the quantity of cigarettes purchased, the wholesale price charged for all tobacco products other than cigarettes sold, the number of individual packages of cigarettes and the number of cigarettes in those individual packages, and the number and denominations of stamps affixed to individual packages of cigarettes sold by the licensee for each place of business in the preceding calendar month. The return shall also include the number and denomination of unaffixed stamps in the possession of the licensee at the

---

[7] The Legislature amended the TPTA in July 2002. Additionally, in December 2002, the Legislature added § 7b to the TPTA, MCL 205.427b, which expressly permits a licensee under the act to deduct bad debts beginning January 1, 2003. This opinion addresses the act's construction before these amendments.

end of the preceding calendar month. Wholesalers and unclassified acquirers shall also report accurate inventories of affixed and unaffixed stamps by denomination at the beginning and end of each calendar month and all stamps acquired during the preceding calendar month. The return shall be signed under penalty of perjury. The return shall be on a form prescribed by the department and shall contain or be accompanied by any further information the department requires.

(3) To cover the cost of expenses incurred in the administration of this act, at the time of the filing of the return, the licensee shall pay to the department the tax levied in subsection (1) for tobacco products sold during the calendar month covered by the return, less compensation equal to both of the following:

(a) One percent of the total amount of the tax due on tobacco products sold other than cigarettes.

(b) One and one-fourth percent of the total amount of the tax due on cigarettes sold.

(4) Every licensee and retailer who, on May 1, 1994, has on hand for sale any cigarettes acquired after February 1, 1994 upon which a tax has been paid pursuant to former 1947 PA 265 [the Cigarette Tax Act] shall file a complete inventory of those cigarettes before June 1, 1994 and shall pay to the department at the time of filing this inventory a tax equal to the difference between the tax imposed in subsection (1) and the tax that has been paid pursuant to former 1947 PA 265.

(5) The department may require the payment of the tax imposed by this act upon the importation or acquisition of a tobacco product. A tobacco product for which the tax under this act has once been imposed and that has not been refunded if paid is not subject upon a subsequent sale to the tax imposed by this act.

(6) An abatement or refund of the tax provided by this act may be made by the department for causes the department considers expedient. The department shall certify the amount and the state treasurer shall pay that amount out of the proceeds of the tax.

(7) A person liable for the tax may reimburse itself by adding to the price of the tobacco products an amount equal to the tax levied under this act.

(8) A wholesaler, unclassified acquirer, or other person shall not sell or transfer any unaffixed stamps acquired by the wholesaler or unclassified acquirer from the department. A wholesaler or unclassified acquirer who has any unaffixed stamps on hand at the time its license is revoked or expires, or at the time it discontinues the business of selling cigarettes, shall return those stamps to the department. The department shall refund the value of the stamps, less the appropriate discount paid.

(9) If the wholesaler or unclassified acquirer has unsalable packs returned from a retailer, secondary wholesaler, vending machine operator, wholesaler, or unclassified acquirer with stamps affixed, the department shall refund the amount of the tax less the appropriate discount paid. If the wholesaler or unclassified acquirer has unaffixed unsalable stamps, the department shall exchange with the wholesaler or unclassified acquirer new stamps in the same quantity as the unaffixed unsalable stamps. An application for refund of the tax shall be filed on a form prescribed by the department for that purpose, within 4 years from the date the stamps were originally acquired from the department. A wholesaler or unclassified acquirer shall make available for inspection by the department the unused or spoiled stamps and the stamps affixed to unsalable individual packages of cigarettes. The department may, at its own discretion, witness and certify the destruction of the unused or spoiled stamps and unsalable individual packages of cigarettes that are not returnable to the manufacturer. The wholesaler or unclassified acquirer shall provide certification from the manufacturer for any unsalable individual packages of cigarettes that are returned to the manufacturer.

(10) On or before the twentieth of each month, each manufacturer shall file a report with the department listing all sales of tobacco products to wholesalers and unclassified acquirers during the preceding calendar month and any other information the department finds necessary for the

administration of this act. This report shall be in the form and manner specified by the department.

(11) Each wholesaler or unclassified acquirer shall submit to the department an unstamped cigarette sales report on or before the twentieth day of each month covering the sale, delivery, or distribution of unstamped cigarettes during the preceding calendar month to points outside of Michigan. A separate schedule shall be filed for each state, country, or province into which shipments are made. For purposes of the report described in this subsection, "unstamped cigarettes" means individual packages of cigarettes that do not bear a Michigan stamp. The department may provide the information contained in this report to a proper officer of another state, country, or province reciprocating this privilege.

We agree that the language of the TPTA does not expressly state a bad-debt deduction. Nevertheless, we conclude that relevant provisions of the act conflict to the extent that they are susceptible to different, reasonable meanings. For example, the language of § 7(3) and § 7(7), both of which address the obligations of the licensee to collect the tobacco tax and pay the tax to the treasury, appears to conflict with the language of § 7a, which states clearly the Legislature's intent that consumers pay the tax. Additionally, because the TPTA includes "use" in the definition of "sale," MCL 205.422(m), the act imposes a tax on the *use* of tobacco products, akin to a use tax payable by the consumer, while simultaneously imposing a tax on the sale of tobacco products, see MCL 205.427(1), similar to a sales tax payable by the wholesaler. This apparently conflicting language creates an ambiguity in the TPTA, such that the construction of the ambiguous language in the Use Tax Act (UTA), MCL 205.91 *et seq.*, by this Court in *Michigan Bell Telephone Co v Dep't of Treasury*, 229 Mich App 200; 581 NW2d 770

(1998), and our Supreme Court in *World Book, Inc v Dep't of Treasury*, 459 Mich 403; 590 NW2d 293 (1999), is relevant to our construction of the TPTA.

As we noted in *Michigan Bell*, "[c]onflicting provisions of a statute must be read together to produce an harmonious whole and to reconcile any inconsistencies wherever possible." *Michigan Bell, supra* at 216, citing *Gross v General Motors Corp*, 448 Mich 147, 164; 528 NW2d 707 (1995); *Weems v Chrysler Corp*, 448 Mich 679, 699-700; 533 NW2d 287 (1995). Moreover, ambiguities in a taxing statute are construed in favor of the taxpayer, *Michigan Bell, supra* at 217, and this Court should avoid construing a statute in a manner that renders any part of it surplusage or nugatory. *World Book, supra* at 417. Consistent, then, with the analysis and method of construction employed in both *Michigan Bell* and *World Book*, we conclude that a bad-debt deduction is available under the TPTA to effectuate the legislative intent that consumers, and not wholesalers, be ultimately responsible to pay the tobacco tax.

In *Michigan Bell*, we interpreted the UTA, which stated that "[e]ach consumer storing, using or otherwise consuming in this state tangible personal property or services purchased for or subsequently converted to such purpose or purposes shall be liable for the tax imposed by this act . . . . The payment to the department of the tax, interest and penalty assessed by the department shall relieve the seller . . . from the payment of the amount of the tax which he may be required under this act to collect from the purchaser." MCL 205.97. The UTA also required sellers to collect the "tax imposed by this act from the consumer," and provided penalties, including liability for the use tax

owed, for a seller's failure to collect the use tax. *Michigan Bell, supra* at 213-214, citing MCL 205.99, MCL 205.106. The plaintiff telephone company asserted that it should not be liable to pay the use tax owed by its customers to the state unless it had actually collected the tax, *Michigan Bell, supra* at 204, whereas the defendant argued that the plaintiff became liable for the tax even if the plaintiff could not collect the tax. The defendant asserted that the UTA did not relieve the seller of liability even if it used reasonable care in collecting the tax and that the act imposes personal liability on the seller for uncollected use tax. *Michigan Bell, supra* at 214-215.

This Court found instead that the Tax Tribunal properly held that the plaintiff "could not be required to pay its customers' use taxes where [the plaintiff] had used reasonable business care in trying to collect them." *Id.* at 212-213. We noted that the UTA reflects that the consumer is the taxpayer and that the seller does not share joint tax liability. *Id.* at 215. "[T]he ultimate burden of paying the tax is on the consumer or purchaser, which is the party exercising the privilege of use, storage, or consumption." *Id.* at 215, citing *Lockwood v Comm'r of Revenue*, 357 Mich 517, 527; 98 NW2d 753 (1959). We also found "that this is an important concept, because it represents one of the primary distinctions between the use tax and the sales tax, the legal incidence of which falls upon the seller only in the case of the sales tax." *Michigan Bell, supra* at 215, citing MCL 205.52. " 'One may be charged with the duty of collecting a tax on behalf of government although the ultimate burden of such tax does not rest on him.' " *Michigan Bell, supra* at 215-216, quoting *Lockwood, supra* at 527.

Importantly, we also opined that the provisions of the UTA that impose the tax on the consumer and the provisions that impose tax liability on the seller "appear to conflict such that a literal reading of each could lead reasonable minds to differ regarding their meaning in relation to one another." *Michigan Bell, supra* at 216. As such, we held that the Tax Tribunal properly engaged in construction of the statute and appropriately decided that before the defendant could subject the plaintiff to use tax liability or criminal penalties, it would have to prove intent or fault on the part of the plaintiff. *Id.* "Unquestionably, [the act] requires . . . more than a mere lack of success in collecting use taxes from its consumers." *Id.* Moreover, we noted that "ambiguities in a taxing statute are to be resolved in favor of the taxpayer," *id.* at 217, and "that [MCL 205.97] imposes the actual tax obligation only on the consumer . . . ." *Michigan Bell, supra* at 217.

In *World Book*, the Michigan Supreme Court agreed with this Court's finding in *Michigan Bell* that the UTA did not require the "seller to become, in effect, its customers' use-tax payment guarantor." *World Book, supra* at 415. The plaintiff in *World Book*, an out-of-state corporation that marketed and sold products in Michigan, conceded that its sales were subject to either the UTA or the General Sales Tax Act (GSTA), MCL 205.51 *et seq.* The initial question before the Court was which of the two taxes applied to the product sales at issue. Although the provisions of these acts supplement and complement each other, *World Book, supra* at 406, citing *Elias Bros Restaurants, Inc v Treasury Dep't*, 452 Mich 144, 153; 549 NW2d 837 (1996), the GSTA expressly permitted the

seller to deduct bad debts when calculating its tax liability, MCL 205.54i, whereas the UTA contained no such express provision. *World Book, supra* at 405-406. After concluding that the UTA applied, the Court then held that the seller's liability for use tax is secondary to the consumer's liability for the tax. *Id.* at 412-413. The Court further found that the department could hold the seller responsible for uncollected taxes only where the department could demonstrate some level of fault on the part of the seller. *Id.* at 413. "If the seller were liable for use tax when unable to collect it through no fault of its own, the tax would fall onto the seller. It would, in effect, convert the use tax into a sales tax." *Id.* at 417, citing *Lockwood, supra* at 527.

Defendant argues that the logic of *Michigan Bell* and *World Book* should not apply in interpreting the TPTA. First, defendant relies on *Cunningham Drug Stores, Inc v Comm'r of Revenue,* 319 Mich 467, 473; 29 NW2d 915 (1947), which construed provisions of the TPTA's predecessor, the Cigarette Tax Act, to argue that because the TPTA imposes a tax on the privilege of selling tobacco products, the TPTA is therefore analogous to the GSTA, which imposes a tax on the privilege of selling products in Michigan, MCL 205.52(1). In short, defendant claims that plaintiffs bear the legal incidence of the tobacco products tax, just as a seller bears the legal incidence of the sales tax. Defendant also contends that MCL 205.427(5), (6), and (7) also support the conclusion that plaintiffs bear the burden of the tax. We reject each of these arguments, however, as they fail to account for and apply the Legislature's specifically expressed intent in § 7a that consumers of tobacco products are to pay the tax imposed by this act. The interpretation urged

by defendant would render plaintiffs guarantors of their customers' tobacco tax. Such a construction of the statute, however, would be wholly inconsistent with the intent of the Legislature.

Defendant also claims that *World Book* and *Michigan Bell* apply only to the UTA as a complement to the GSTA. As plaintiffs note, however, *Michigan Bell* and *World Book* both emphasized the language and consumer orientation of the UTA. The complementary nature of the UTA and GSTA played no part in this Court's analysis in *Michigan Bell*. Furthermore, while the Supreme Court noted in *World Book* that imposing primary tax liability on the seller would eviscerate the distinction between the use tax and the sales tax, *World Book, supra* at 417, the Court did not rely on the provisions of the GSTA to justify its construction of the complementary act.

Next, defendant claims that the trial court failed to give deference to the treasury department's interpretation of the act. Specifically, defendant points to 1999 AC, R 205.452, promulgated by the department, which addresses tax liability for stamps "which are lost through negligence, theft, or mysterious disappearance or which are not otherwise accounted for in the records of the wholesaler or unclassified acquirer." Defendant argues that this rule demonstrates that the department interprets the TPTA as imposing the tax on the wholesaler. As plaintiffs assert, however, this rule does not pertain to a customer's failure to pay a wholesaler for tobacco products. Additionally, having been promulgated in 1998, this rule is not a "longstanding" interpretation of the

TPTA that is worthy of great deference by this Court.[8] See *Motycka v Gen Motors Corp*, 257 Mich App 578, 581; 669 NW2d 292 (2003); *Barker Bros Constr v Bureau of Safety & Regulation*, 212 Mich App 132, 136; 536 NW2d 845 (1995).

Additionally, defendant claims that its decision to deny plaintiffs' refund requests is sanctioned by MCL 205.427(6), which provides that "[a]n abatement or refund of the tax provided by this act may be made by the department for causes the department considers expedient. . . ." We disagree with the construction of the statute proposed by defendant, which would give the department nearly unfettered discretion to grant or deny a refund. First, the provision permits defendant to *make* refunds for expedient reasons, not *deny* refunds for expedient reasons. More importantly, defendant seeks to use this provision both to avoid its clear statutory authority to grant a refund and to ignore the trial court's order to calculate the amount due and owing to plaintiffs. Under MCL 205.22, aggrieved taxpayers may appeal departmental decisions. MCL 205.427(6) does not permit defendant

---

[8] Although we are cognizant of instances in which this Court has deferred to an agency's construction of a statute, we question the continued viability of this precedent. We review questions of statutory interpretation de novo, *Schaub, supra*, which, by definition, precludes granting deference to a lower tribunal's interpretation of a statute. See *Buchanan v City Council of Flint*, 231 Mich App 536, 542 n 3; 586 NW2d 573 (1998). Further, as our Supreme Court recently reiterated, " '[a]n agency interpretation cannot overcome the plain meaning of a statute.' " *Koontz v Ameritech Services, Inc*, 466 Mich 304, 324; 645 NW2d 34 (2002), quoting *Consumers Power Co v Pub Service Comm*, 460 Mich 148, 157 n 8; 596 NW2d 126 (1999). We also note that it is within the province of the courts, not administrative agencies, to determine and apply the law. *Charles Reinhart Co v Winiemko*, 444 Mich 579, 591-592; 513 NW2d 773 (1994).

to disregard an appellate ruling simply because it does not agree with the court's reasoning.[9]

Furthermore, defendant asserts that the trial court ignored legislative history that evidences a legislative intent *not* to include a bad-debt deduction in the TPTA. As defendant notes, when introduced in January 1997, HB 4215 contained a provision permitting the deduction of bad debts when calculating the tax levied. Because that provision did not survive the enactment of HB 4215, defendant claims the Legislature did not intend to permit a bad-debt deduction. Although "[w]here the Legislature has considered certain language and rejected it in favor of other language, the resulting statutory language should not be held to explicitly authorize what the Legislature explicitly rejected," *In re MCI*, 460 Mich 396, 415; 596 NW2d 164 (1999), our construction of the statute does not rest on what the Legislature *expressly* authorized but on how to harmonize conflicting statutory provisions. In addition, rather than expressly rejecting a bad-debt deduction, it is equally plausible that the Legislature decided that an expressly stated provision for a bad-debt deduction was unnecessary in light of the addition of § 7a, expressing its intent to impose the tax on the consumer.

In summary, we reconcile the conflicting provisions of the TPTA in the same manner as the UTA was construed by this Court in *Michigan Bell* and by the

---

[9] Defendant also claims that because plaintiffs have no information concerning the whereabouts of the tobacco products, the department did not act "arbitrarily and capriciously" in denying the refund request. Defendant fails to explain, however, how this affects the question of law before the Court. Whether plaintiffs can substantiate their losses may affect the ultimate judgment in this matter, but does not affect whether, as a legal question, plaintiffs may take a bad-debt deduction.

Supreme Court in *World Book*. Because, like the UTA, the TPTA levies the tax on the consumer but does not impose joint tax liability on the wholesaler, we conclude that the sanctions for a wholesaler's failure to pay the tax may not be imposed when the wholesaler's failure to pay occurs because of its good faith inability to collect the tax that is the responsibility of the consumer. Similarly, when a wholesaler prepays the tax on behalf of consumers and is unable to recoup the tax, the wholesaler may seek reimbursement from defendant.

### B. IMPACT OF THE EFFECTIVE DATE OF §7a

Alternatively, defendant argues that the trial court erred by failing to limit its ruling to permit reimbursement to plaintiffs only for taxes paid after the effective date of § 7a.[10] We disagree.

We first reject defendant's assertion that because § 7a of the TPTA did not take effect until 1997, the consumer focus of the TPTA did not exist before the 1997 enactment of § 7a and no reimbursement for claims arising before December 30, 1997, is warranted.

---

[10] Defendant did not raise this argument in its first motion for summary disposition concerning the Abraham case, but properly raised it in its other motions for summary disposition. However, as defendant notes in its statement of questions presented, the trial court did not specifically address the effect of the effective date in its rulings. Ordinarily, an issue is not properly preserved if the trial court does not decide the issue. *Fast Air, Inc v Knight*, 235 Mich App 541, 549; 599 NW2d 489 (1999). Nevertheless, we consider the issue because defendant's claim of error is that the trial court failed to consider the effective date of the statute. To the extent that defendant failed to initially raise the issue in the Abraham case, we address the issue as a question of law, having knowledge of all of the facts necessary for resolution of the issue. *Steward v Panek*, 251 Mich App 546, 554; 652 NW2d 232 (2002).

While the Legislature generally may be presumed to change the law when it amends a statute,

> "[t]he rule is not applied in reverse for the purpose of determining the meaning of the statute before amendment by presuming that it must have been something different than that which is the clear intent of the statute after amendment. * * * While in many and perhaps most instances it undoubtedly is the legislative intent, in enacting an amendment to change existing law, there are, as undoubtedly, other instances, particularly if uncertainty exists as to the meaning of a statute, when amendments are adopted for the purpose of making plain what the legislative intent had been all along from the time of the statute's original enactment." [*Production Credit Ass'n of Lansing v Dep't of Treasury*, 404 Mich 301, 319; 273 NW2d 10 (1978), quoting *Detroit Edison Co v Janosz*, 350 Mich 606, 87 NW2d 126 (1957)].

Accordingly, we will not presume that before the Legislature enacted § 7a, the Legislature did not intend to impose the tobacco-products tax on the consumer.

Second, while we agree with defendant's contention that the addition of § 7a to the TPTA did not alter the payment scheme set forth in §§ 7(5), 7(6), and 7(7) of the act, the conclusion we reach from this fact differs from that which defendant proposes. We find that the amendment of the TPTA adding § 7a represented the Legislature's attempt to clarify the act rather than to change its focus. In our judgment, the fact that the payment scheme was not altered by the addition of § 7a supports rather than undercuts the conclusion that the focus of the act did not change, and that the act also contained a consumer focus to the tax before its amendment. In other words, by its amendment adding § 7a, the Legislature attempted to communicate more clearly that which it had always intended

under the act; although the tax was to be collected by the wholesaler for transmittal to the department, the tax ultimately was to be imposed on the consumer. Therefore, while the trial court did not address this issue, we find no basis to limit the amount of the reimbursement to taxes paid after the effective date of § 7a.

### C. CONTEMPT PROCEEDINGS

Defendant next asserts that the trial court erred by awarding plaintiffs attorney fees and costs as contempt sanctions. We agree.

Pursuant to MCL 600.1701(g), "parties to actions, attorneys, counselors, and all other persons . . . disobeying any lawful order, decree, or process of the court" may be held in contempt. Although the trial court's order presumes an underlying finding of contempt, the trial court did not make findings that defendant was in contempt of the prior Court of Claims order. When adjudicating contempt proceedings without a jury, the trial court "must make findings of fact, state its conclusions of law, and direct entry of the appropriate judgment." *In re Contempt of Calcutt*, 184 Mich App 749, 758; 458 NW2d 919 (1990), citing MCR 2.517(A). Without specific findings that defendant was in contempt of an order of the court, the trial court lacked any basis for awarding plaintiffs attorney fees and costs.[11]

---

[11] We do not remand to the trial court for findings of fact and conclusions of law, however, because numerous procedural defects tainted the contempt "hearing." First, defendant's alleged disobedience of the Court of Claims order occurred outside the court's presence, requiring compliance with the procedures detailed in MCR 3.606. *Auto Club Ins Ass'n*, *supra* at 712-713, 718; see also MCL 600.1711. Contrary to MCR 3.606,

### D. SPECIFIC REFUND DETERMINATIONS

Finally, defendant disputes the trial court's refund determinations for Eby-Brown and Motor City. We conclude that the trial court's decision in each case is supported by competent, material, and substantial evidence and, therefore, affirm its decision in each case.

In the Eby-Brown matter, rather than presenting live testimony, the parties submitted exhibits for the trial court's consideration. In support of its claim for a refund, plaintiff submitted a copy of its letter requesting a refund for $24,739.50, an exhibit showing interest calculations through February 21, 2002, a copy of the letter from the department delineating its position and denying Eby-Brown's request, and a copy of the department's Decision and Order of Determination in this matter. In response, defendant submitted a summary of Eby-Brown's claim, an analysis of the merit of the claim, and a schedule of Eby-Brown's uncollectible accounts compiled by defendant that reduces Eby-Brown's claim to $17,359.12.[12]

---

plaintiffs did not institute the contempt proceedings with a motion to show cause or support their motions for contempt with affidavits (other than an affidavit supporting the amount of attorney fees requested). As such, the trial court lacked jurisdiction over defendant. *Steingold, supra* at 159, quoting *Michigan ex rel Wayne Prosecutor v Powers*, 97 Mich App 166, 168; 293 NW2d 752 (1980). Moreover, plaintiffs did not fulfill their obligation to advise defendant whether the contempt being alleged was criminal or civil in nature, see *Auto Club Ins Ass'n, supra* at 716, citing *In re Contempt of Robertson*, 209 Mich App 433, 438; 531 NW2d 763 (1995), and did not appear to serve their motions by personal service on the alleged contemnor, as required when the alleged contempt consists of disobeying an order of the court, *Steingold, supra* at 158; MCL 600.1968(4); MCR 2.107(B).

[12] Defendant has not provided these exhibits to the Court for our review.

The trial court noted that, in its Decision and Order of Determination, defendant had not found a lack of diligence that would justify denying Eby-Brown's claim. Although defendant admitted that Eby-Brown had not received payment for the tobacco products, defendant argued that a refund was inappropriate because Eby-Brown could not document what happened to the tobacco products after they were sold. However, as Eby-Brown stated in its response to defendant's request to inspect the tobacco products, if plaintiff had access to the products, the accounts would not be uncollectible. Defendant fails to articulate what documentation Eby-Brown could provide to more adequately substantiate its claims, and defendant's request for evidence concerning the whereabouts of the products after their sale does not defeat Eby-Brown's refund request. Accordingly, the evidence the trial court relied on satisfies the substantial evidence test.

Regarding the trial court's decision with respect to Motor City, defendant challenges Motor City's request concerning its account with R&J and argues that the trial court erred by concluding that Motor City exercised reasonable collection efforts and was therefore eligible to be reimbursed for prepaid taxes. Rex Pierce, former administrator of the tobacco tax for defendant, testified that the department denied the claim because Motor City had in its possession a check from R&J for approximately $127,000 that it did not cash because it knew that R&J did not have funds to cover the check, but nevertheless continued to sell products to R&J and, subsequently, receive additional bad checks. Despite this evidence, the trial court found that plaintiff had used reasonable efforts

to collect the debt and should not be prohibited from receiving a refund on that basis.

We conclude that the trial court's decision was based on competent, material, and substantial evidence. Robert Feucht, vice-president and co-owner of Motor City, testified that Motor City's business practice was to receive a business check from a customer at the time of purchase and then hold that check until the customer returned (usually within seven days) with a cashier's check to replace the original check. According to Feucht, before R&J delivered the $127,000 check that it could not cover, R&J had been a "faithful" paying customer of Motor City for approximately five years.

Plaintiff did not attempt to cash the $127,000 check dated July 12, 1994, until September 27, 1994. Feucht testified that in the interim, R&J provided a number of explanations why it was having difficulty making payment on the $127,000 check and also provided what appeared to be legitimate assurances that the amount owed would be paid. When Motor City learned from the bank that R&J's account contained insufficient funds to cover the check, Motor City decided to continue supplying R&J, believing that if it failed to continue to supply R&J, R&J would make even fewer sales from which Motor City could recover payment on the $127,000 debt. Feucht also testified that if his company had been able to cash the $127,000 check at any time, it would have done so. Additionally, Motor City's attorney testified that he pursued informal collection efforts and filed suit when these informal efforts failed. We conclude that this testimony constituted competent, material, and substantial evidence in support of the trial court's

conclusion that Motor City used reasonable efforts to collect the debt owed by R&J.

IV

We conclude that the trial court properly resolved the ambiguity in the TPTA in plaintiffs' favor and determined that plaintiffs are entitled to reimbursement for tobacco-product taxes paid on uncollectible accounts. This conclusion applies equally to plaintiffs' claims accruing before and after the amendment of the TPTA that added § 7a. We reverse the trial court's award of attorney fees and costs in light of the procedural irregularities that tainted the "contempt" proceedings and the trial court's failure to make specific findings of contempt. Finally, we conclude that the trial court's factual findings that Eby-Brown and Motor City were entitled to reimbursement for prepaid taxes are supported by competent, material, and substantial evidence.

Affirmed in part and reversed in part.